**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Michael Donald KENNEDY, Defendant-Appellant.**

No. 77–2276.

United States Court of Appeals, Ninth Circuit.

April 21, 1978.

Juanita J. Brooks (argued), San Diego, Cal., for defendant-appellant.

R. Michael Bruney, Asst. U. S. Atty. (argued and on the brief), Terry J. Knoepp, U. S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

Before WRIGHT and CHOY, Circuit Judges, and SOLOMON, District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

Kennedy appeals from his conviction for transporting and receiving firearms in interstate commerce. 18 U.S.C. §§ 922(g) and (h) and 924(a).

He moved unsuccessfully to suppress a firearm found in his residence by FBI agents executing a search warrant. He argues that the questioning which yielded the information establishing probable cause for the warrant was an overbroad investigatory stop or, alternatively, a custodial interrogation without *Miranda* warnings. We conclude that the district court erred in denying the motion to suppress, and reverse the convictions.

## I.

## FACTS

On February 28, 1977, the San Diego County Health Department Bureau of Records notified FBI Special Agent Durr that a 16-year old male had requested the birth certificates of four deceased persons. Because such information often led to detection and prosecution of state and federal offenses, Durr arranged surveillance.

Durr followed the young man from the Bureau of Records to a parking lot, where Kennedy and another juvenile met him in Kennedy's pickup truck. FBI agents in three vehicles followed them through downtown San Diego. A license check indicated that the plates affixed to the pickup had been issued to a 1973 Datsun, owned by a Tennessee resident. Agents in two cars following Kennedy's truck motioned it to the side of the road.

On Durr's request, Kennedy entered an FBI car. In response to questions he iden-

* Senior District Judge, District of Oregon.

tified the juveniles as runaways and established his ownership of the truck. When asked for identification, he produced his wallet which yielded, aside from his genuine identification, a temporary driver's license under an assumed name. He had obtained it by using the birth certificate of a deceased person, which he also produced. He also carried credit cards under two other names and explained that his son had given him one card and that an unknown woman had given him the other.

The agents then questioned Kennedy about his arrest record and possession of weapons.[1] He said that he had been convicted of bank robbery in Tennessee, was currently on parole, and that his presence in San Diego violated the parole terms. He admitted possession of a rifle that he found in Tennessee and brought with him to San Diego.

The interrogation continued for 45 minutes. The agents gave no *Miranda* warnings. After local police officers arrived and took custody of the juveniles, the FBI agents told Kennedy he was free to leave.

The agents returned to their office, obtained a search warrant for Kennedy's residence, executed it the next day, and found the firearm that Kennedy sought to suppress.

## II.

### INVESTIGATORY STOP

Kennedy concedes there was "founded suspicion" justifying the initial stop of his vehicle. *United States v. Solomon*, 528 F.2d 88, 90–91 (9th Cir. 1975); *Wilson v. Porter*, 361 F.2d 412, 415 (9th Cir. 1966). He argues, however, that the length and scope of the inquiry should have been limited by the circumstances justifying the initial intrusion. We agree. *Terry v. Ohio*, 392 U.S. 1, 18–19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Luckett*, 484 F.2d 89, 91 (9th Cir. 1973).

In *Lowe v. United States*, 407 F.2d 1391, 1394 (9th Cir. 1969), we suggested guidelines for the permissible scope of inquiries in routine traffic stops: officers are entitled to require a driver to identify himself, provide proof of vehicle ownership and, if not satisfied with his responses, ask his destination and business.

■ Here the discrepancy in vehicle license information and Kennedy's passenger's receipt of the birth certificates of deceased persons justified the initial stop. These circumstances, however, could not justify the extended inquiry into Kennedy's arrest history or possession of weapons. *United States v. Luckett*, 484 F.2d at 91 (officers having no reasonable grounds to suspect that a person stopped for jaywalking had been charged with other crimes could not detain him to check for outstanding warrants).

The government offers *United States v. Richards*, 500 F.2d 1025 (9th Cir. 1974), as authority supporting the legality of Kennedy's detention. In *Richards*, authorities detained for more than an hour two persons about to take off in a private airplane. We found the length of the detention was justified by the agents' attempts to verify the suspects' evasive answers to routine questions.

■ The government's reliance on *Richards*, however, is misplaced. We found the lengthy detention justified in *Richards* because the scope of inquiry was limited to questions of identification and of ownership of the aircraft. *Richards* may justify the length but not the breadth of inquiry here.[2]

---

1. Durr testified that he asked Kennedy about the presence of weapons at his residence because the agents were considering questioning a third juvenile who lived with Kennedy. The government justifies the inquiry as cautious police work. Although that may show caution, it also solicited an admission of criminal activity. We also note that the agents' subsequent conduct does not bear out their professed intent.

2. Had the agents' questions related only to circumstances justifying the initial stop, the lengthy detention perhaps would be justified. Kennedy produced various and conflicting pieces of identification and the agents were justified in detaining him to verify his identity. *United States v. Richards*, 500 F.2d at 1029; *United States v. Jackson*, 448 F.2d 963, 968–69 (9th Cir. 1971).

Durr testified that information concerning the receipt of birth certificates of deceased persons had led to successful prosecutions for a variety of state and federal offenses. He questioned Kennedy, "fishing" for such a violation. Though the possession of a deceased person's birth certificate may have justified a check for outstanding warrants, it did not justify the probing intrusions in search of some criminal activity.

## III.

### CUSTODIAL INTERROGATION

Kennedy argues that the agents' failure to administer the *Miranda* warning offended his Fifth Amendment privilege against self-incrimination.

■ The Supreme Court has declared that "custodial interrogation" is inherently coercive. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Suspects must be informed of their rights to assure they are able to exercise them.

The questioning was initiated by the agents, but the government contends that Kennedy was never "in custody." In *Lowe v. United States*, we adopted an objective, reasonable man standard for determining whether one is in custody. There we directed the trial court to consider all "circumstances which might have led defendant *reasonably to believe that she could not leave freely*" in deciding whether the defendant was in custody during questioning. 407 F.2d at 1397, *quoting People v. Arnold*, 66 Cal.2d 438, 58 Cal.Rptr. 115, 426 P.2d 515 (1967) (emphasis in original). *See United States v. Bekowies*, 432 F.2d 8, 12 (9th Cir. 1970).

The relevant circumstances here are these: there were four FBI agents present when Kennedy was stopped; he was con-

fined to the backseat of an FBI vehicle with an agent (a second agent sat in the front seat); and another agent sat in Kennedy's truck with one of the juveniles during the questioning.

Durr testified that the agents questioned Kennedy in their vehicle because of chilly weather. He explained that the questioning continued for 45 minutes because it took that long for local police officers to arrive to take custody of the juveniles. He implied that they questioned Kennedy to keep themselves occupied, and that the questioning would have ended sooner had the police arrived sooner. Finally, Durr testified that Kennedy was free to leave and "drive on down the road" at any time.

Assuming Durr's testimony is true, and we have no reason to doubt his veracity, Kennedy was not in fact in custody. The relevant inquiry, however, is whether a reasonable person would have believed himself to be.

■ The record indicates that Kennedy was not made aware of the agents' subjective purposes for the questioning and though he may have been free to leave at any time, another agent sat nearby in the pickup during the interrogation. The totality of these circumstances would lead a reasonable man to believe that he was in custody. *United States v. Bekowies*, 432 F.2d at 12–14. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

The government contends that these circumstances are analogous to those of *Lowe*, and argues that the interrogation was merely "on-the-scene inquiries." In *Lowe*, however, we held only that "the questioning of a driver of a stopped car *on an open highway by one policeman, without more,* cannot be characterized as a 'police dominated' situation, or as 'incommunicado' in nature." 407 F.2d at 1394 (emphasis added).

This situation is not the same. Four agents made the stop. Two of them interrogated appellant for 45 minutes. They

solicited information about a past criminal record and possession of weapons. Absent *Miranda* warnings, such questions cannot be asked in the custodial environment presented here.

Reversed and remanded.