**UNITED STATES of America, Plaintiff,**

v.

**Avelino HIGAREDA–SANTA CRUZ, Defendant.**

**Crim. No. 92–140–PA.**

United States District Court, D. Oregon.

May 7, 1993.

Charles H. Turner, U.S. Atty., John C. Laing, Sp. Asst. U.S. Atty., Portland, OR, for plaintiff.

Steven Jacobson, Asst. Federal Public Defender, Portland, OR, for defendant.

## OPINION

PANNER, District Judge.

Defendant Avelino Higareda–Santa Cruz is charged with one count of possessing cocaine with intent to distribute. He moves to suppress evidence and statements. I grant his motion.

### FINDINGS OF FACT

At about 2 a.m. on October 7, 1992, Oregon State Police Trooper Frank Hagen was sitting in his parked car at milepost 248 on Interstate 5, three miles south of Salem. He saw defendant driving northbound in a 1984 Toyota Supra, ahead of a truck and two or three other vehicles. Hagen saw nothing unusual about defendant's driving. He did not remember whether he noticed that defendant appeared to be Hispanic.

Hagen testified that a couple of minutes later, he started driving back to patrol office because he was tired. At about milepost 252, Hagen saw defendant's car trailing the group of vehicles, driving between 40–45 miles per hour in a 55 miles per hour zone. Hagen testified that he suspected that defendant was intoxicated because the car was weaving. Defendant testified that he was "driving straight" and had slowed down because of fog.

■ Hagen's report, written the next day, stated that defendant's tires had touched the lane lines, which would not violate any traffic laws. However, at the hearing, Hagen testified that he independently recalled that defendant's tires had crossed the lane lines, a traffic infraction. See ORS 811.370. I find Hagen's testimony that defendant crossed the lane lines incredible because it conflicts with his contemporaneous report of the arrest. See United States v. de la Jara, 973 F.2d 746, 751–52 (9th Cir.1992) (district court committed clear error by crediting police officer's in-court testimony while rejecting the officer's conflicting contemporaneous report).

Hagen turned on his overhead lights and pulled defendant over. As Hagen walked to defendant's car, he noticed it had California license plates. While Hagen was talking to defendant, Hagen saw no indication that defendant was intoxicated. Defendant told Hagen that he was tired. Hagen thought defendant was "overly friendly" because he seemed "willing to do anything. He was just, 'Yes, sir,' 'No, sir,' and he was smiling and I could see that he was somewhat nervous also." Hagen noticed fast food wrappers in the car. Hagen thought that defendant was "sort of unsure" about how he had purchased the car. Hagen concluded that "it was just not a normal contact and that was what drew my suspicion." Hagen took defendant's license and vehicle registration and walked back to his patrol car.

Once in his car, Hagen radioed for another state trooper to back him up. Hagen testified that normally he would not ask for backup after pulling a driver over for failure to

maintain a lane, but that he was concerned because a trooper had recently been killed in Klamath Falls. Hagen had computer checks run on defendant's driver's license and registration, which revealed nothing improper. When Senior Trooper David Frye arrived as back-up, Hagen told Frye that he planned to ask defendant for consent to search the car.

Hagen walked back to defendant's car and returned his license and registration. Hagen warned defendant to stay in his lane and told him that he was free to leave. Defendant started the car and asked Hagen whether there were any motels nearby. Hagen testified that he told defendant that there were motels at the next exit and then asked whether defendant would mind being asked a few questions before he left.

Defendant testified that after Hagen told him he was free to leave, Hagen told defendant to wait and made a hand gesture indicating that he should stay. Defendant testified that he did not consider himself free to drive away.

Hagen asked defendant where he was going. Defendant said he was driving to Yakima, Washington to pick up his grandmother. Defendant denied having any drugs, weapons, or large amounts of cash in the car. Hagen asked if he could search the car. According to Hagen, defendant replied, "If you want to look." Hagen said, "Yes, if you don't mind." Defendant turned off his engine and Hagen asked, "Are you sure you don't mind if I search the entire vehicle?" Defendant replied, "No problem." Hagen testified that when he told defendant that he did not have to consent to the search, defendant replied, "I don't have anything inside the vehicle."

Neither Hagen nor Frye drew their handguns. While Hagen searched the car, Frye made small talk in English with defendant, speaking in simple words and short sentences.

Hagen noticed a screwdriver on the front passenger-side floor. He then saw that the vent cover was secured with screws not usually found on cars like defendant's. Hagen used the screwdriver to remove the screws, but the vent cover was stuck. Hagen then saw that the right rear panel was slightly ajar. He stuck the screwdriver in the panel and with a flashlight noticed three taped bundles inside. Hagen eventually recovered about five kilograms of cocaine from defendant's car.

After Hagen discovered the cocaine, defendant was handcuffed with his hands behind his back and placed in the back seat of a police car. Hagen read defendant *Miranda* rights in English three times. *Miranda v. Arizona*, 384 U.S. 436, 473, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). After each time, defendant told Hagen that he did not understand. Hagen noticed that "the conversation was gradual[ly] swaying away from English into Spanish and there was a communication problem."

Hagen testified that he then held a card printed with *Miranda* rights in Spanish in front of defendant's face because defendant was still handcuffed. Hagen stated that defendant seemed to move his head back and forth as though he was reading the card. Hagen asked defendant whether he understood and defendant did not respond. Hagen testified that he then said, "Comprende?," and defendant replied, "Yes," in English. None of the officers asked defendant whether he was willing to waive his rights.

Defendant testified that Hagen showed him a card with *Miranda* rights printed in English, but not in Spanish. Although Frye remembered Hagen giving defendant *Miranda* warnings in English, he did not remember seeing Hagen show defendant a Spanish *Miranda* warning card. I find that defendant was not shown the Spanish *Miranda* card.

Gloriela Webster, a Spanish/English translator, testified that Hagen's Spanish *Miranda* rights card was probably written by a person who knew Spanish as a second language. Webster translated the card back into English as follows:

1. You have the right to maintain yourself in silence.

2. Anything you say may be used against you in a court of law.

3. You have the right to consult an attorney before you make your statement.

**358**

4. In case that you do not have money, you have the right to petition an attorney from the court.

5. You have the right that your attorney be present in case that you make any statement.

6. You have the right to interrupt the conversation at any moment.

7. Anything you say must be freely and voluntarily.

Documents in Support of Motions to Suppress at 5.

Defendant was taken to the Patrol Office in Salem. Several hours later, he made incriminating statements.

Defendant was born in Mexico and moved to the United States in 1984, when he was about fourteen years old. Defendant spoke Spanish almost exclusively at home, and Spanish speakers were usually available to help when defendant went to stores or the post office.

Defendant attended junior high school in Encinitas, California for about three years. Although some of his classes were taught in English, most of the teachers were bilingual. Defendant learned little English.

Marjorie Terdal, a linguist, tested defendant's ability to understand English. Terdal testified that if she asked defendant, "Do you mind if I search the car?," defendant would understand "something about looking in the car but he wouldn't really get the whole idea of what it means to say 'Do you mind if.'" Because of defendant's difficulty with "if" clauses, he could not understand Terdal's question, "Well, if you go back to Mexico, will you have a right to visit your family in San Diego?"

Terdal also thought that the phrase, "do you mind" would be more difficult for defendant than the phrase, "may I." Defendant did not understand Terdal's question, "Do you know that you have a right to study ESL [English as a Second Language]?"

Defendant was very cooperative with Terdal. She testified that he tended to indicate greater understanding than he actually had. She stated that people learning a second language typically are reluctant to admit when they do not understand.

## DISCUSSION

### I. Traffic Stop

A traffic violation will "support a brief investigatory stop." *United States v. Baker*, 850 F.2d 1365, 1368 (9th Cir.1988). In arguing that the stop here was justified, the government cites *United States v. Bertrand*, 926 F.2d 838, 844 (9th Cir.1991). There, the defendant was pulled over on suspicion of driving while intoxicated because he was driving ten miles per hour below the speed limit and veering across the center line.

Defendant contends that his continued detention was not justified and that the stop either was or became a pretext for a narcotics investigation. The length and scope of a police inquiry is limited by the facts justifying the initial stop. *United States v. Kennedy*, 573 F.2d 657, 659 (9th Cir.1978).

I conclude that Hagen had just enough "founded suspicion" to justify the initial stop. *See Kennedy*, 573 F.2d at 659. Although defendant remained within his lane, driving below the speed limit and even slight weaving within a lane could signal an intoxicated driver.

However, once Hagen realized that defendant was not intoxicated, he had no further reason to detain defendant. He detained defendant while he checked defendant's driver's license and vehicle registration and waited for a back-up state trooper to arrive. Hagen also questioned defendant after returning the license and registration. Hagen failed to limit the "length and scope of the inquiry ... by the circumstances justifying the initial intrusion." *Kennedy*, 573 F.2d at 659.

I also conclude that the continued detention of defendant after the initial stop was a pretext to obtain defendant's consent to search for drugs. *See United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir.1988) ("The classic example [of a pretextual stop] ... occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in

illegal drug activity."). An arrest may not be used as a pretext to search for evidence of an unrelated crime. *United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir.1986). The issue turns on the motivation of the arresting officer. *United States v. Huffhines*, 967 F.2d 314, 317 (9th Cir.1992).

After Hagen confirmed that defendant was not intoxicated, he continued to detain defendant only because he wanted to search defendant's car for drugs. Hagen's vague suspicion that "it was just not a normal contact" did not justify continued detention of defendant. Hagen knew that defendant was a young, "overly friendly" Hispanic man whose car contained fast-food wrappers, that defendant was driving north in a car with California license plates, and that defendant was vague in describing how he had purchased the car. Hagen did not have the founded suspicion that could justify further detaining defendant after the initial stop.

## II. Consent

▮ Defendant contends that his consent to the search of his car was not voluntary. The voluntariness of consent is a question of fact determined by the totality of the circumstances. *United States v. Vasquez*, 858 F.2d 1387, 1389 (9th Cir.1988), *cert. denied*, 488 U.S. 1034, 109 S.Ct. 847, 102 L.Ed.2d 978, 489 U.S. 1029, 109 S.Ct. 1161, 103 L.Ed.2d 220 (1989). The government has the burden of showing that consent was voluntary. *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1299 (9th Cir.1988).

▮ I conclude that defendant did not voluntarily consent to the search of his car. Because defendant's grasp of English was rudimentary, he did not understand that he could refuse Hagen's request. The testimony of the linguistics expert shows that although defendant could understand simple English sentences, he would not have understood Hagen's requests containing the phrases, "If you don't mind" or "Are you sure you don't mind?" *Cf. United States v. Gutierrez-Mederos*, 965 F.2d 800, 803 (9th Cir.1992) (district court properly rejected linguistics expert's testimony because expert did not personally examine the defendant), *cert. denied*, — U.S. —, 113 S.Ct. 1315, 122

L.Ed.2d 702 (1993). At most, defendant understood that Hagen wanted to look in his car. As both Hagen and the linguistics expert noticed, defendant is extremely cooperative and appears to understand English even when he does not.

In addition, defendant's consent was tainted by the illegal detention. *See Delgadillo-Velasquez*, 856 F.2d at 1299 ("mere fact that consent to search is voluntary ... does not mean that it is untainted by a prior illegal arrest."); *cf. State v. Arroyo*, 796 P.2d 684, 688–92 (Utah 1990) (applying taint analysis when defendant consented to search after pretextual traffic stop). The court should examine (1) whether *Miranda* warnings were given; (2) the closeness in time of the arrest to the consent; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Delgadillo-Velasquez*, 856 F.2d at 1299.

Here, defendant gave his consent immediately after the illegal detention but before any *Miranda* warnings. There were no important intervening circumstances. Most importantly, Hagen's purpose in continuing to detain defendant was specifically to obtain defendant's consent to search the car. Defendant's consent was tainted by the illegal detention, even if his consent could otherwise be considered voluntary. *See id.* at 1300 (consent may be voluntary under Fifth Amendment yet invalid under Fourth Amendment).

## III. *Miranda* Warnings

▮ Defendant moves to suppress statements he made after Hagen arrested him. *Miranda* warnings must indicate to the defendant that an attorney will be appointed for the defendant if he cannot afford one. *Duckworth v. Eagan*, 492 U.S. 195, 204, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166 (1989).

I have found that defendant was not shown the Spanish *Miranda* card. Defendant could not understand his rights in English, so he did not validly waive his *Miranda* rights.

Even if defendant had read the Spanish rights card, the card's statement of the rights was inadequate. As translated, the card states, "In case that you do not have

money, you have the right to petition an attorney from the court." The statement implies that a defendant must be completely without money before he can obtain an appointed attorney. It also implies that even if a defendant has no money, he might not obtain counsel because he must "petition" the court for an attorney. *Cf. United States v. Soria–Garcia,* 947 F.2d 900, 901–03 (10th Cir.1991) (Spanish *Miranda* statement, "If you don't have the money to employ a lawyer one will be appointed to you before answering any questions," was adequate even though it did not state that attorney would be appointed at no cost to the defendant). The English *Miranda* warnings read to defendant cannot rescue the faulty Spanish warnings because defendant could not understand the English warnings.

 Even if the Spanish *Miranda* rights card had been adequate, I conclude that the government has not shown that defendant made a valid waiver. The validity of a waiver depends on the totality of the circumstances. *United States v. Bernard S.,* 795 F.2d 749, 751 (9th Cir.1986). The defendant's background, experience, conduct, and language difficulties are relevant. *Id.* at 751–52. There is a presumption against waiver and the burden is on the government to show waiver. *Id.* at 752.

 Although Hagen testified that defendant answered, "Yes," to his question, "Comprende," defendant never expressly waived his rights. A waiver cannot be presumed from a defendant's subsequent confession. *United States v. Wallace,* 848 F.2d 1464, 1475 (9th Cir.1988). The circumstances of the arrest lead me to conclude that defendant did not make a valid waiver.

## CONCLUSION

Defendant's motion to suppress evidence and statements (# 13) is granted.