# AMERICAN SAMOA GOVERNMENT, Plaintiff,

### v.

# DAVID GALUMALEMAGA, Defendant.

High Court of American Samoa
Trial Division

CR No. 98-00

February 14, 2001

Before KRUSE, Chief Justice, and ATIULAGI, Associate Judge.

Counsel: For Plaintiff, John W. Cassell, Assistant Attorney General
For Defendant, Bentley C. Adams III, Assistant Public Defender

## ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS

The defendant David Galumalemaga ("Galumalemaga") is charged with unlawful possession of a controlled substance under A.S.C.A. §§ 13.1022 and 13.1006. Just after midnight on the morning of August 30, 2000, Galumalemaga returned from work release to the Correctional Facility in Tafuna, where he was serving detention as a probation condition. He encountered PSO Pasi Sua'ava ("PSO Sua'ava"), the guard on duty at the time. Siaosi Aiono, the watch commander, ordered PSO Sua'ava to conduct a routine search of Galumalemaga, including a search of Galumalemaga's shoes. Inside the flap of one shoe, PSO Sua'ava spotted what appeared to be three cigarettes of marijuana. Without giving Galumalemaga the *Miranda* warnings, PSO Sua'ava asked him "What is this?" and Galumalemaga replied, "Give me a chance."

On December 11, 2000, Galumalemaga submitted a motion in limine to suppress "any and all statements of any nature obtained from defendant by government agents," as well as a motion to suppress the contraband marijuana seized by PSO Sua'ava on August 30, 2000. We discuss our denial of these motions as follows.

## I. Motion to Suppress Statement

Galumalemaga claims that his statement to PSO Sua'ava was made while in custody, during an interrogation, without consultation with known appointed counsel, and without adequate advisement of his rights. Because he was not administered the *Miranda* warnings, and did not have the opportunity to waive them, Galumalemaga argues that the statement was illegally obtained in violation of his Fourth, Fifth or Sixth Amendment Rights of the U.S. Constitution, as well as Article I, Sections 5 and 6 of the Revised Constitution of American Samoa, and therefore must be suppressed.

■ As well established by *Miranda v. Arizona*, self-incriminating statements given by a suspect during custodial interrogation without a prior warning are in violation of constitutionally protected rights, and are subject to the exclusionary rule. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966). However, in order to trigger *Miranda*, an individual must be in custody, and must be subject to official interrogation. A statement made by a person who was not in a custodial situation is not subject to suppression on *Miranda* grounds. *Am. Samoa Gov't v. Fealofa'i*, 24 A.S.R.2d 10, 11-

12 (Trial Div. 1993). In *Berkemer v. McCarty*, the Court stated, "[f]idelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." 468 U.S. 420, 437 (1984). The first issue, then, is whether Galumalemaga was subject to the sort of coercive conditions contemplated by *Miranda*.

Custodial interrogation has been taken to mean "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. The intent inspiring the *Miranda* requirement is to protect individuals subjected to inquisition in a "police-dominated atmosphere," *Miranda*, 384 U.S. at 445, which is said to generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467.

■ Custodial interrogation is distinguishable from on-the-scene questioning, which does not require *Miranda* warnings. The Court stated that the required warnings "[are] not intended to hamper the traditional function of police officers in investigating crime." *Miranda*, 384 U.S. at 477-78. It further clarified that "[g]eneral on-the-scene questioning as to the facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." *Id.* In *Lowe v. United States*, the Ninth Circuit reasoned that such questions, posed during the fact-finding process, enable officers "to determine whether a crime has been committed or is in progress." 407 F.2d 1391, 1393-94 (9th Cir. 1969).

■ The general test for determining whether custodial interrogation has occurred is whether a reasonable person would have believed he could not leave freely. *United States v. Kennedy*, 573 F.2d 657, 660 (9th Cir. 1978). Such a test has been held inapplicable in a prison setting, where prisoners may not, by definition, leave freely, and where such a test would thus be tantamount to a pragmatically untenable per se custody finding. *See United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985). The Ninth Circuit in *Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir. 1978), refined the dicta in the Supreme Court case of *Oregon v. Mathiason*, 429 U.S, 492, 495 (1977) (per curiam)[1] to create a standard for custody in prison situations according

---

[1] In *Mathiason*, the Supreme Court held that a suspect who voluntarily comes to a police station is not "in custody" for *Miranda* purposes. The Court recognized that some coercive element inevitably arises in any interview with police officers, which are "part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." The

to the relative level of "restriction" experienced by the prisoner. Specifically, it applied the same four factors cited for the "free to leave" test used in *United States v. Curtis*, 568 F.2d 643, 646 (9th Cir. 1978), for determining situations which would require *Miranda* warnings:

> [T]he language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him must be considered to determine *whether a reasonable person would believe there had been a restriction of his freedom over and above that in his prisoner setting.*

*Cervantes*, 589 F.2d at 428 (emphasis added). The Fourth Circuit in *Conley* interpreted the restriction as a relative concept that "necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." *Conley*, 779 F.2d at 973 (citing *Cervantes*, 589 F.2d at 428). The question, then, is whether during the interrogation, the inmate "was subjected to more than the usual restraint on a prisoner's liberty to depart." *Conley*, 779 F.2d at 973.

■ The *Cervantes* case concerned an on-scene investigative situation very much resembling the current case before the Court. A prisoner was being moved from one cell to another when his belongings were searched and a small matchbox with a green odorless substance was found. An officer asked him, "What's this?" to which the prisoner replied, "That's grass, man." The court held the statement admissible, ruling that in the prison setting, on-the-scene investigative questioning does not reach the level of restriction contemplated by the *Miranda* warnings. The Ninth Circuit reasoned that requiring *Miranda* warnings to every prison investigation could "totally disrupt prison administration," and would illogically provide more protection to a prisoner than a non-prisoner in on-the-scene investigative matters.[2] *Cervantes*, 589 F.2d at 427. We agree with, and

---

line between custodial and non-custodial situations cannot, therefore, depend on the mere presence of police officers in a confined setting, but rather on the "totality of circumstances" involved. *California v. Beheler*, 463 U.S. 1121, 1125 (1983), further cited *Mathiason*, in its formulation of the test for custody in technically noncustodial situations: "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

[2] The Ninth Circuit distinguished its ruling from that of the Supreme Court in *Mathis v. United States*, 391 U.S. 1 (1968). In *Mathis,* the Supreme Court ruled that evidence obtained from a prisoner during a routine tax investigation was illegal because the Internal Revenue agent had not administered the *Miranda* rights. The Ninth Circuit pointed to the difference between the tax investigation and on-the-scene questioning, as

27

follow, this rule and its reasoning.

■ In the current case, Galumalemaga was returning on his own from an unsupervised work release program and had just entered prison grounds. He was subjected to a routine search procedure that required his shoes to be taken off and checked. The officer saw the three cigarettes in the shoe before spontaneously asking Galumalemaga what they were. Galumalemaga immediately answered him. These circumstances are a straightforward example of the in-prison, on-the-scene questioning considered by the Ninth Circuit. Galumalemaga was undergoing a routine search procedure; the search yielded questionable artifacts; the officer queried him on-the-scene; Galumalemaga answered him subject to none of the threats, deceptions, or intimidations that tend to complicate *Miranda* custody questions. We find no evidence of the coercive, police-dominated setting contemplated by the *Miranda* decision, nor any basis for inferring one. Even though Galumalemaga was in the process of transitioning from the relative independence of work release to the prison setting, at the time of his search, he was already in the Correctional Facility, on which premises at least he is considered a full-fledged prison inmate. We conclude that Galumalemaga's constitutional right against self-incrimination has not been violated and hold that statements to PSO Sua`ava are admissible.

## II. Motion to Suppress Physical Evidence

Galumalemaga argues that the contraband discovered in his shoe during the August 30, 2000, search by PSO Sua`ava should be suppressed because it was carried out in violation of his constitutional rights.

The first issue is whether Galumalemaga, an inmate returning to the prison from work release, had a Fourth Amendment right against unreasonable searches and seizures, as expressed in Article I, Section 5, of the Revised Constitution of American Samoa. This assures the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." *See Mapp v. Ohio*, 367 U.S. 643, 656 (1961); *Am. Samoa Gov't v. Afamasaga*, 17 A.S.R. 145, 148 (Trial Div. 1990). Prisoners are guaranteed this right against unreasonable searches and seizures "at least to some minimal extent." *Bonner v. Coughlin*, 517 F.2d 1311, 1317 (7th Cir. 1975).[3] However, this right has been limited for

---

well as to the pragmatic implications for prison administration of requiring warnings before any and all types of questioning.

[3] The Supreme Court in *Hudson v. Palmer*, 468 U.S. 517, 523 (1984), clearly states that "prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration."

prisoners,[4] primarily as a "practical matter, to accommodate a myriad of 'institutional needs and objectives' of prison facilities, . . . chief among which is internal security." *Hudson*, 468 U.S. at 524 n.4.

■ The existence of a Fourth Amendment right is determined by whether the person claiming it has a "justifiable," or "reasonable," or a "legitimate expectation" of privacy with respect to the place searched and/or the item seized, as measured by his or her subjective expectation. *Hudson*, 468 U.S. at 525; *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Rakas v. Illinois*, 439 U.S. 128, 137-38 (1978); *Katz v. United States*, 389 U.S. 347, 353 (1967). This standard is limited by what "society is prepared to recognize as 'reasonable.'" *Hudson*, 468 U.S. at 525 (citing *Katz*, 389 U.S. at 360, 361 (Harlan, J., concurring)). The reasonable expectation standard is thus clearly restricted when the individual asserting the expectation is incarcerated or in custody. *United States v. Savage*, 482 F.2d 1371, 1372-73 (9th Cir. 1973) (applying *Katz*). In a prison setting, the test of reasonableness requires a balancing test between the need for the search against the invasion of personal rights that the search entails. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

■ PSO Sua`ava has testified that prison procedures required him to check all inmates returning to the prison in a routine manner for drugs, weapons, or tools that might be used to escape. Such a policy is obviously necessary and reasonable, given the pragmatic concerns of prison security. The evidence indicates that Galumalemaga was returning from work release, where he was unsupervised and in constant contact with unincarcerated persons.[5] Galumalemaga had every reason to expect that his shoe would be

---

[4] As reasoned in *Lanza v. New York*, 370 U.S. 139 (1962) (citations omitted), and cited in *United States v. Dawson*, 516 F.2d 796, 805 (6th Cir. 1975):

> [T]o say that a public jail is the equivalent of a man's "house" or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument . . . . [W]ithout attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day.

*See also Palmigiano v. Travisono*, 317 F.Supp. 776 (D.R.I. 1970).

[5] The Supreme Court stated: "Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for anti-social criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the

searched, not only because he was returning from work release to the highly supervised life of the prison, but also because such searches were routine procedure, routinely performed. Further, the search entailed no threat, nor intimidation, nor body cavity exposure, but merely a patdown and peering into Galumalemaga's shoe, and posed a minimal degree of intrusion upon his privacy. Therefore, we conclude that, as an inmate returning from work release, Galumalemaga has no reasonable expectation of privacy, and therefore no Section 5 right, regarding routine pat-down and shoe search procedures.[6]

Galumalemaga's constitutional rights under Article I, Sections 5 and 6, of the Revised Constitution of American Samoa were not violated by PSO Sua`ava's search and questioning on August 30, 2000. The motions to suppress defendant's statement and the evidence obtained during the search are, therefore, denied.

---

legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others. . . . Within this volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison." *Hudson*, 468 U.S. at 526-27.

[6] Relevant caselaw has variously held that bodily searches held incident to routine prison security procedures are not violative of the Fourth Amendment rights of inmates. In *Daughtery v. Harris*, 476 F.2d 292 (10th Cir.), the court held that the procedure requiring rectal searches on release from court appearance are not violative of the Fourth Amendment rights of inmates even in absence of a showing of special cause justifying such searches, given necessary and reasonable nature of the requirement in a maximum security institution, and given that the search was performed by trained medical assistants. In *Bell v. Wolfish*, 441 U.S. 520, 558 (1979), it was held that the practice of visual body-cavity searches of pretrial detainees following contact visits were neither unreasonable nor unconstitutional, and could be conducted on less than probable cause. Finally, in *United States v. Dawson*, it was held that a prisoner has no reasonable expectation of privacy in his jail cell. 516 F.2d 796, 805 (9th Cir. 1975) (using the test in *Katz v. United States*, 389 U.S. 347 at 361 (1967)). All of these cases depended, more or less, on the practical circumstances of insuring the safety and confinement of the prison environment.