**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jose Alfredo PEREZ–LOPEZ,**
**Defendant–Appellant.**

**No. 02–30358.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 10, 2003.

Filed Nov. 7, 2003.

Stephen R. Sady, Chief Deputy Federal Public Defender, Portland, OR, for the defendant-appellant.

Frank Noonan, Assistant United States Attorney, Portland, OR, for the plaintiff-appellee.

Before: GOODWIN, HUG, and BERZON, Circuit Judges.

BERZON, Circuit Judge.

Appellant Jose Alfredo Perez–Lopez ("Perez–Lopez") is a 39–year–old Mexican with a third-grade education who speaks very little English. Perez–Lopez lived in the United States illegally beginning in 1999. In 2002, he entered a conditional guilty plea to a single count of producing false identification documents in violation of 18 U.S.C. § 1028(a)(1).

On April 5, 2002 Perez–Lopez rented a motel room in Woodburn, Oregon. The next day Virginia Wang, a motel employee, entered the room to clean and noticed a large printer, a typewriter, pieces of identification, a lamination machine, and blank identification cards on the bathroom counter. Suspecting that the inhabitant was producing false identification cards, she called the Woodburn Police Department. Officer Rick Weaver drove to the motel, discussed with Wang what she had seen, and learned that Perez–Lopez spoke Spanish. He therefore requested a translator. Officer Bill Torres responded, and the officers proceeded together to Perez–Lopez's motel room.

The precise events that followed are in some dispute. According to Weaver's report:

We knocked on the door of room 120. The door was answered by Perez. Perez appeared nervous. I advised Perez we had received a report he my [*sic*] be

making false identification cards in the room. Perez stepped to the door way preventing me from looking into the room. Perez stepped into the door frame and placed his right shoulder next to the frame and then closed the door up against his back.

Perez paused for a few minutes and then let us into the room. Perez said he had been involved with making identification cards. Perez was advised of his rights and signed the [*Miranda*] card. A consent to search card was also obtained from Perez. Perez consented to a search of his room.

Weaver's report further states that Perez–Lopez answered questions about making identification cards and manufactured a Nayarit, Mexico driver's license for Weaver, using information provided to him by the officer. While Perez–Lopez was making this identification card, Torres checked the sleeping area for evidence but found none. Weaver recorded the presence of a typewriter, a color scanner, a printer, a copy machine, a laminating machine, and a Polaroid camera, all found on the bathroom counter. The report added that there was also "a FedEx envelope with blank identification card stock and lamination material to make social security, INS, California drivers license and assorted other identification cards."

Weaver did not testify at the suppression hearing, although he was present. Instead, Torres testified, stating that he was only on the scene to translate and was not an active participant in the investigation. Torres represented that his memory depended on Weaver's report, yet his account differed from Weaver's in some particulars. Torres said that after Perez–Lopez opened the door:

The conversation was real pleasant and cordial. We advised him of complaints from the manager [*sic*] that . . . when she went in to clean the room, there was some laminating issue paper found in the room. We asked him if he knew of anyone that may be, you know, preparing INS or any type of false documentation or false identification.

[ . . . ]

At first he hesitated. He didn't fully reply. . . . I asked him again if he knew anything about these illegal documents and after hesitating for a few minutes more, he said yes.

[ . . . ]

I asked him if it would be okay for us to come on in, into the room. At that point, he smiled and said that yes, it would be okay. What he did then is he opened the door fully open to allow us full view of the living section of the room.

[ . . . ]

At that point . . . with his words as well as body's [*sic*] motions, we took that as consent to come on in, which Officer Weaver and I did.

Torres further testified that once he and Weaver entered the room, Weaver went past the beds toward the bathroom area. At that point, Weaver signaled to Torres that items of interest were there. Torres then read Perez–Lopez a consent-to-search card written in Spanish, which Perez–Lopez signed at 12:18 P.M. Torres also read him *Miranda* rights from the Spanish side of a prepared card, part of which the district court recorded as: "En caso de que no tenga dinero, Ud. tiene el derecho de solicitar de la corte un abogado." Torres testified that the English translation of this portion of the Spanish warning he read to Perez–Lopez is: "In case you don't have enough money or funds, you have the right to solicit the Court for an attorney." Perez–Lopez signed this *Miranda* card at 12:20 P.M.

On the stand, Perez–Lopez, through an interpreter, told a markedly different story. He testified that he opened the door thinking it was his wife and by then "the officer was already in—about two steps in.... [The officer] asked me where I had the drugs. [Before that, he] asked me if he could come in. I told him he was already in." Perez–Lopez testified that after he told this officer, Torres, that he did not use or sell drugs, he was instructed to sit on the bed. After Perez–Lopez sat down, Weaver entered the room and went to the bathroom area: "When the officer went straight to the bathroom, Officer Torres told me to sign this little card that he had and that if I didn't sign it that he would arrest me." Perez–Lopez signed the card as requested, although he was unclear about how many cards were shown to him. He stated that he never told anybody that he gave the police permission to enter his room before they did. The government did not cross-examine Perez–Lopez.

After Perez–Lopez was arrested on April 6, 2002, Weaver contacted an Immigration and Naturalization Service (INS) agent about Perez–Lopez's production of false INS identification cards. On April 9, INS Special Agent Ted Weimann interviewed Perez–Lopez, after giving him a rights advisory, while he was in state custody. Approximately forty minutes after leaving, Weimann contacted Perez–Lopez by telephone and asked him if he had given permission to the officers to enter, whether the officers used force, and whether he understood the *Miranda* warning given at the Woodburn motel. Concerning this telephone conversation, which was not transcribed, Weimann testified:

[I asked Perez–Lopez if] prior to the police entering the room ... if they had

his permission to enter the room. And he said that they did. And then I asked him if, prior to questioning him about the production of false documents, if they advised him of his *Miranda* rights, in the Spanish language, and he said that they did.

And then I asked him if he understood those rights, and he said that he did. And then I said, I just want to clarify one thing for sure to make sure that the police did have his permission to enter his hotel room and that they didn't use any force to enter his hotel room. And Mr. Perez said that, yes, that was all true. And then he said on his own, he said, "I gave them permission to enter the room."

On April 17, Perez–Lopez was indicted by federal authorities. He was arrested on April 22 and arraigned on the same day.

Perez–Lopez moved to suppress "all physical evidence, statements, and derivative evidence." Denying the motion, the district court credited Torres's testimony, which it considered to be "in accord with Weaver's report." The court summarized the sequence of events following the officers' initial contact with Perez–Lopez as follows:

Torres testified that defendant hesitated at first, but then said he was making documents. Torres asked whether the officers would be permitted to enter the room, and after some delay defendant said it would be OK and opened the door. Torres testified that defendant indicated by words and gestures that the officers could enter the room.

Torres read defendant his rights from a consent-to-search card and a *Miranda* warning card, both in Spanish. After listening to Torres, defendant signed waivers on the back of the cards.[1] Tor-

---

1. If this finding by the district court means

that both warnings were given before Perez–

res testified that defendant did not appear to be under the influence of drugs and that defendant never said that he did not want to speak with the officers. He appeared cordial and cooperative.

In Weaver's report of the search, he wrote that defendant was advised of his *Miranda* rights and "signed the card," and that defendant consented to a search of the room. Weaver reported that defendant then demonstrated how he made identification cards with an instant camera, blank identification cards, and a laminating machine.

The district court found that the "[d]efendant signed the cards for consent and *Miranda* warnings, indicating that he had knowingly waived his rights." The court also concluded that Perez–Lopez's consent to search the room was voluntary. Finally, the court stated that the initial *Miranda* "warning was not so misleading as to require suppression of defendant's subsequent statements."[2]

After filing his appeal with this court Perez–Lopez was deported to Mexico. Because a presumption of collateral consequences attaches to a conviction, we retain jurisdiction to review Perez–Lopez's conviction. *See United States v. Verdin,* 243 F.3d 1174, 1177 (9th Cir.2001). Perez–Lopez argues, *inter alia,* that his motion to suppress should have been granted because: (1) he gave no consent to the officers to enter his motel room; (2) his consent to their search was not voluntary; and (3) his statements at the motel were preceded by a flawed *Miranda* warning. Further, Perez–Lopez objects to the

Lopez signed either card, it is clearly erroneous. Torres testified that he "obtained the consent form signature and then read *Miranda* rights." There was no contrary testimony.

2. Because the district court did not rely in its consent to search analysis on Perez–Lopez's

length of the detention that followed his arrest.

## DISCUSSION

■■■ Denial of a motion to suppress is reviewed *de novo,* but underlying findings of fact are reviewed for clear error. *United States v. Cervantes,* 219 F.3d 882, 887 (9th Cir.2000). The adequacy of a *Miranda* warning is a question of law that is reviewed *de novo. United States v. Connell,* 869 F.2d 1349, 1351 (9th Cir.1989).

### I

Perez–Lopez first contends that the district court's finding that there was voluntary consent to the entry into Perez–Lopez's room is clearly erroneous, pointing primarily to inconsistencies between Torres's testimony and Weaver's report. The two accounts were similar in that both agreed that Perez–Lopez assented to entry into his room but did so only several minutes after the officers first made contact with him.

There were, however, some discrepancies. The story relied on by the district court was essentially an amalgam of the two accounts by Weaver and Torres, using Torres's testimony to fill in the gaps of Weaver's report. Although the district court stated that the accounts are "in accord," the court actually relied on distinct features of each account to construct its findings of fact.

While there are some other minor differences, one discrepancy between Torres's

interaction with INS Agent Weimann or rule on the adequacy of Weimann's *Miranda* warning, we do not address appellant's arguments regarding that questioning in this decision. Should the issues remain relevant on remand, the district court can address them at that time.

testimony and Weaver's report stands out: Weaver never reported an oral assent to the initial entry, while Torres did, yet Torres was only the interpreter and stated that his recollection of the events was hazy. Torres described a conversation he had with the appellant at the door of Perez–Lopez's room, stating that he asked Perez–Lopez for permission to enter the room and that Perez–Lopez granted it, smiling and saying "yes, it would be okay [to come in]." Weaver's report states only that "Perez paused for a few minutes and then let us into the room."

■ For us to determine that the district court committed clear error, there would have to be no permissible version of the evidence emanating from Torres's testimony and Weaver's report supporting the events the court found to have occurred. *United States v. Working*, 224 F.3d 1093, 1102 (9th Cir.2000) (en banc). That is not the case. Sufficient commonalities exist in these versions to justify the district court's chosen view. Both officers represented that Perez–Lopez admitted them to his room and later signed a consent-to-search card. Although Torres's account includes an oral assent to enter lacking from Weaver's report, there is no direct conflict on that point. It was therefore within the district court's discretion to credit Torres's testimony that Perez–Lopez orally consented to the officers' entry.

Perez–Lopez further argues that Torres's testimony was impeached by comments the officer made to a defense investigator, to whom Torres recalled his initial statement to Perez–Lopez as follows: "We have a report that you're dealing in false identification. If that's true, we'd like to go in and search your room." This minor discrepancy between Torres's testimony and his earlier account is explicable: On the same day that Perez–Lopez was arrested, there was a similar incident concerning another inhabitant of the same motel "that was dealt with ... in a different way because of third-party involvement [initial denial of consent to search]." [3] Torres testified that there was some confusion when he spoke with the defense investigator about which of the two incidents they were discussing. A reasonable person could believe that Torres was simply mistaken about which case he went over with the defense investigator.

■ In short, the district court's assessment of the evidence does not meet the threshold of clear error. As we have stated:

> Even if other judges might have reached a different conclusion, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."

*Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

**II**

■ Perez–Lopez also objects to the district court's finding that his consent to

---

**3.** Officer Weaver's report states that another room in the motel was rented by a Mr. Pacheco, with a home address in the same Astoria, Oregon complex where Perez–Lopez lived. Motel employee Wang was also "suspicious" of Pacheco. Two hours after Perez–Lopez was arrested, Pacheco returned and, according to Weaver's report: "Sgt Torres speaking Spanish, obtained a signed rights and consent to search card from Pacheco. Pacheco admitted to making counterfeit identification cards and selling them. Pacheco gave permission to search his room, room 118."

search was voluntary and therefore valid. We are mindful that the government's burden to show voluntariness "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). "Voluntariness is a question of fact to be determined from all the surrounding circumstances. When viewing the surrounding circumstances, there is no single controlling criterion." *United States v. Kaplan,* 895 F.2d 618, 622 (9th Cir.1990) (quotation marks and citation omitted).

■ The district court correctly looked to our decision in *United States v. Cormier,* 220 F.3d 1103 (9th Cir.2000), in assessing the voluntariness of Perez–Lopez's consent based on the totality of circumstances. *Cormier* enumerated five non-exclusive factors relevant to this inquiry: "(1) whether defendant was in custody;[4] (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was told he had the right not to consent; and (5) whether the defendant was told that a search warrant could be obtained." *Id.* at 1112; *see also United States v. Chan–Jimenez,* 125 F.3d 1324, 1327 n. 3 (9th Cir.1997) ("Although the presence or absence of one of these factors is not dispositive of the voluntariness inquiry in any given case, many of this court's decisions upholding consent as voluntary are supported by at least several of the factors."). Citing *Cormier,* the district court applied some of these factors, writing that "[t]he officers did not draw their guns, and defendant did receive *Miranda* warnings. They notified defendant that they suspected a crime."

We note, initially, that the relevance of *Miranda* warnings to whether a consent to search was voluntary is not readily apparent. *Miranda* warnings do not in terms address the right to refuse to agree to a search but rather focus on involuntary incriminating statements. *See Dickerson v. United States,* 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) ("[In *Miranda,* we] concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment ... not to be compelled to incriminate himself.' " (quoting *Miranda v. Arizona,* 384 U.S. 436, 439, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966))).

Reliance on the *Miranda* factor in this context entered our circuit's case law in *United States v. Noa,* 443 F.2d 144, 147 (9th Cir.1971), a case which relied on *Gorman v. United States,* 380 F.2d 158 (1st Cir.1967). In *Gorman,* the First Circuit rejected the suggestion that a defendant in custody must be given a warning that he need not consent to a search for that consent to be valid, explaining:

> While the police interrogators must faithfully carry out *Miranda's* mandate at the threshold, they may then proceed to elicit responses, however incriminating, without further specific warning. To single out for further warning a request to search premises of an accused is to assume that a different order of risks has not been covered at the threshold. But *that things which might be found in a search could be used against an accused seems implicit in the warning of the right to remain silent* [.]

4. The government does not challenge Perez–Lopez's custodial status at the time he was given a *Miranda* warning at the motel.

*Id.* at 164 (emphasis added). There was thus thought to be a prophylactic effect generated by the *Miranda* warning that extends to an accused's subsequent consideration of whether to consent to a search. *But cf. United States v. Lemon,* 550 F.2d 467, 472 (9th Cir.1977) ("A consent to search is not the type of incriminating statement toward which the fifth amendment is directed.").

The Supreme Court's decision in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), established a "totality of all the circumstances" test for voluntariness of consents to search and held that "knowledge of a right to refuse is[not] an indispensable element of a valid consent. The considerations that informed the Court's holding in *Miranda* are simply inapplicable in the present case." *Id.* at 227, 246, 93 S.Ct. 2041. Subsequently, our circuit continued to employ the presence or absence of *Miranda* warnings as a relevant factor. *See, e.g., United States v. Morning,* 64 F.3d 531, 533 (9th Cir.1995). While under *Schneckloth* "it is not irrelevant that the person had been told he could remain silent ... a frightened and confused defendant might well not suspect that the *Miranda*-type warning is equally applicable to a search." 3 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 8.2(j), at 692 (3d ed.1996) (quotation marks and citation omitted). It is open to question, therefore, whether the inclusion or exclusion of *Miranda* warnings in a given set of circumstances should weigh much in either direction in considering voluntariness.

In any event, the district court's analysis is incorrect insofar as it depended upon *Miranda* warnings. It supports neither the court's finding that the consent to search was valid nor its failure to suppress

the post-*Miranda* statements made by Perez–Lopez.

■ Torres's credited testimony establishes that the officers' entry to Perez–Lopez's room occurred and Weaver proceeded to find some items in the bathroom area *before* any *Miranda* warning was given. Also according to Torres, the consent to search form was signed *before* Torres read Perez–Lopez his *Miranda* rights; consistent with that testimony, the consent form has an earlier signature time. When a *Miranda* warning follows rather than precedes the purported consent, it cannot support the voluntariness of the consent.

Because the district court erroneously considered the *Miranda* warning to be a factor weighing in favor of finding Perez–Lopez's consent to search to have been voluntary, we remand for the court to reconsider the validity of the search by conducting anew the "totality of all the circumstances" analysis described in *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041, and its progeny.

### III

■ The district court's analysis of the sufficiency of the *Miranda* warning was also inconsistent with our case law. The district court stated:

Defendant argues that Torres used a fatally flawed Spanish translation of the *Miranda* warnings. The card from which Torres read stated in part, "En caso de que no tenga dinero, Ud. tiene el derecho de solicitar de la corte un abogado." At the hearing, Torres translated this statement into English to mean, you have the right to solicit the court for an attorney if you have no funds.

As translated by Torres, the statement is arguably inaccurate to the extent it implies that a person who lacks funds is not automatically appointed an attorney,

but rather must "solicit" the court for one. I conclude, however, that under these facts the warning was not so misleading as to require suppression of defendant's subsequent statements. "The translation of a suspect's *Miranda* rights need not be a perfect one, so long as the defendant understands that he does not need to speak to the police and that any statement he makes may be used against him." *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir.1990); *see also United States v. Bustillos–Munoz*, 235 F.3d 505, 515–16 & n. 6 (10th Cir.2000) (ambiguity in Spanish version of *Miranda* warnings did not make waiver invalid).

*Miranda* itself stated that admissibility of any statement given during custodial interrogation of a suspect depends on whether the police provided the suspect with four warnings: "the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that *if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda*, 384 U.S. at 479, 86 S.Ct. 1602 (emphasis added); *see also Dickerson*, 530 U.S. at 435, 120 S.Ct. 2326. We have underscored that thoroughness and clarity are especially important when communicating with uneducated defendants. Not only must"[t]he warning ... be clear and not susceptible to equivocation," but *"Miranda* [also] requires '... meaningful advice to the unlettered and unlearned in language which [they] can comprehend and on which [they] can knowingly act.'" *United States v. San*

*Juan–Cruz*, 314 F.3d 384, 387 (9th Cir. 2002) (quoting *Connell*, 869 F.2d at 1351). In *San Juan–Cruz*, we added that "[t]he warning ... must make clear that if the arrested party would like to retain an attorney but cannot afford one, the Government *is obligated* to appoint an attorney for free." *Id.* at 388 (emphasis added); *see also Connell*, 869 F.2d at 1353.[5]

In this case Perez–Lopez's warning was constitutionally infirm because it did not convey to him the government's *obligation* to appoint an attorney for indigent accused. To be required to "solicit" the court, in the words of Torres's warning, implies the possibility of rejection. While *"Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures," *California v. Prysock*, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981), *Miranda* does not permit such an affirmatively misleading advisory. *See San Juan–Cruz*, 314 F.3d at 388 (holding improper warnings that do not ensure that an accused person can "reasonably ascertain from the warnings provided to him by the Government whether he could or could not retain the services of an attorney for free"). "Regardless of circumstance, the *Miranda* warning must be read and conveyed to all persons clearly and in a manner that is unambiguous." *Id.* at 389.

The Tenth Circuit cases relied on by the district court for its contrary conclusion actually support our holding. The law of that circuit is that "[a] translation of a suspect's *Miranda* rights need not be perfect if the defendant understands that he or she need not speak to the police, that

---

**5.** In *Connell*, the defendant was first told that "you must make your own arrangements to obtain a lawyer and this will be at no expense to the government," and later that "a lawyer *may* be appointed to represent you." 869 F.2d at 1353. The court in *Connell* relied in part on the ambiguity in the latter statement,

*see id.* ("[U]sing the word 'may,' leaves the impression that providing an attorney, if Connell could not afford one, was discretionary with the government."), and in part on the prior assertion that the arrangements to retain a lawyer would not be at government expense.

any statement made may be used against him or her, that he or she has a right to an attorney, and that an attorney *will* be appointed if he or she cannot afford one." *United States v. Hernandez*, 93 F.3d 1493, 1502 (10th Cir.1996) (citing *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir.1990)) (emphasis added). In the earlier *Hernandez* case, cited by the district court, a critical feature distinguishing the facts before us is that the defendant was found to have understood an English *Miranda* warning despite "some ambiguity" in the translated version: "[T]he district court found that Hernandez's repeated communications with the trooper in English indicated that he did in fact understand English." *Hernandez*, 913 F.2d at 1510. Perez–Lopez, by contrast, received no English-language *Miranda* warning (and would not have understood one in any event), but could have been misled by the Spanish warning Torres gave him.

In *United States v. Bustillos–Munoz*, 235 F.3d 505 (10th Cir.2000), another case concerning ambiguity in a *Miranda* warning translation, the imprecision at issue did not negate any of the four core requirements of *Miranda*. *See id.* at 517 ("[T]he warning which Bustillos–Munoz disputes (informing him that even if he decided to answer questions without an attorney present, he had the right to change his mind and to request consultation with an attorney), is *not* one of the warnings required by the *Miranda* decision."). Perez–Lopez's incorrect advisory, by contrast, did concern one of *Miranda's* fundamental cautions.

It is worth noting that a prior ruling by the very district court that decided this case properly ascertained a problem with a Spanish translation similar to the one on the card read to Perez–Lopez. *United States v. Higareda–Santa Cruz*, 826 F.Supp. 355, 359–60 (D.Or.1993), observed that "[a]s translated, the [*Miranda*] card states, 'In case that you do not have money, you have the right to petition an attorney from the court.' The statement implies that a defendant must be completely without money before he can obtain an appointed attorney. *It also implies that even if a defendant has no money, he might not obtain counsel because he must 'petition' the court for an attorney.*" (emphasis added). Despite this ruling, it appears, at least one police department in Oregon is still using a similar flawed Spanish *Miranda* warning. *Cf. Connell*, 869 F.2d at 1353 n. 3 (quoting with approval Judge Norris's dissenting opinion in *Guam v. Snaer*, 758 F.2d 1341, 1344 (9th Cir. 1985), stating that language in standardform printed *Miranda* warnings must be particularly carefully scrutinized because "it is a simple matter for the police to avoid allegations of error in *Miranda* warnings by reading the defendant his rights from a prepared form").

In sum, we conclude that *Miranda* as interpreted by our precedents compels reversal of the district court's approval of the warning given to Perez–Lopez. As a result, Perez–Lopez's post-*Miranda* incriminating statements should have been suppressed as improperly obtained.

### IV

 Perez–Lopez objects to the fact that he "was not indicted until April 17, 2001, eleven days after his arrest on April 6, 2001, and did not see a judicial officer until five days later on April 22, 2001," so that there was "no judicial determination of probable cause ... within 48 hours" of his detention. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 57, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). There is, however, no evidence of collusion between federal and state officers to delay Perez–Lopez's federal arrest. The analy-

sis (which the district court did not undertake) of whether Perez–Lopez's statements to INS Agent Weimann were voluntary under 18 U.S.C. § 3501 is therefore unaffected by this delay. "[A] duty to present a person to a federal magistrate does not arise until the person has been arrested for a *federal* offense." *United States v. Alvarez–Sanchez*, 511 U.S. 350, 358, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). Perez–Lopez was arrested for a federal offense on April 22, 2002 and arraigned on the same day, bringing his appearance before a magistrate within the permissible 48-hour window. *See United States v. Michaud*, 268 F.3d 728, 734 n. 2 (9th Cir. 2001) ("Although the state police did not comply with their constitutional duty to bring Michaud before a magistrate within 48 hours of her arrest ... this delay cannot be attributed to the federal agents and considered for purposes of § 3501(c) absent evidence of collusion.").

## V

As the voluntariness of Perez–Lopez's consent to search must be reassessed and because of the *Miranda* violation contained in the Spanish-language rights card used by Torres to advise Perez–Lopez of his rights, we REVERSE the district court's denial of the motion to suppress and REMAND for further proceedings consistent with this opinion.