Filed 4/29/15  P. v. Duran CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CANDACE ROCHELLE DURAN,<br><br>    Defendant and Appellant. | G050925<br><br>(Super. Ct. No. INFO59828)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Graham A. Cribbs, Judge.  Affirmed.

George L. Schraer for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Candace Rochelle Duran guilty of voluntary manslaughter, as a lesser included offense of first degree murder, and found true an allegation she used a knife in the commission of the crime. The court imposed a total prison term of 12 years, consisting of the upper term of 11 years for voluntary manslaughter, plus a consecutive one-year term for the use of a deadly weapon.

Defendant challenges the judgment on grounds the trial court erroneously admitted impeachment evidence of pending felony charges against her, violated *Miranda v. Arizona* (1966) 384 U.S. 436 by admitting her pretrial statement to police, failed to instruct the jury self-defense applies to voluntary manslaughter as well as murder, and relied on improper aggravating factors to impose the upper term sentence. We find no reversible error and affirm the judgment.

**FACTS**

*The Crime*

In the early afternoon of September 23, 2007, defendant's cousin, Deidre Allen, went to defendant's Palm Springs home to return a borrowed drill. Allen knocked on the front door, but no one answered. Allen heard music playing inside and the sound of a vacuum cleaner, so she sat down near a fountain in the front yard to wait. After about 5 or 10 minutes, defendant opened the door, yelled Allen's name, and slammed the door shut. Allen then decided to open the door herself and go inside.

Allen found defendant standing to one side of the door, talking excitedly and repeatedly saying Villanueva had come at her with a knife. In the dining room, Allen saw Villanueva lying in a pool of blood. At first, Allen did not know what to do so she called a couple of relatives before dialing 911. As reflected in a recording of the 911 call, Allen spoke to the dispatcher first. Allen told the dispatcher defendant said the handyman attacked her with a knife. The dispatcher asked to speak directly to defendant, and defendant told the dispatcher a man attacked her and she was scared. After the 911

2

call, Allen saw defendant punch herself in the face several times, actions Allen attributed to stress. Allen also noticed defendant's clothes were wet.

Emergency personnel arrived at defendant's home around 2:30 p.m. They found Villanueva lying on the dining room floor in a pool of blood. The pool of blood turned out to be 20 to 25 percent of his total blood volume. A paramedic administered CPR, but Villanueva was nonresponsive. Villanueva was pronounced dead at 3:02 p.m.

According to one emergency responder, the house smelled of cleaning fluid. A crime scene technician saw a bucket, a bottle of bleach, and a bloody knife in the bathroom. There was blood on the walls of the dining room, hallway, and bathroom.

*Prosecution Case*

A pathologist testified Villanueva died as a result of exsanguination caused by 12 stab wounds of varying depths and locations on his body, including the back of his head, chin, cheek, and left shoulder, arm, and armpit. Although the pathologist considered one particular wound that transected Villanueva's left jugular vein and carotid artery as the primary wound, the pathologist also testified Villanueva died as a result of the cumulative effect of all the stab wounds. The pathologist identified one probable defensive wound, a through-and-though stab to the palm of Villanueva's left hand which severed the ulnar artery. The pathologist also testified Villanueva, who weighed 250 pounds, had 763 nanograms of methamphetamine and 55 nanograms of amphetamine per milliliter of blood in his system at the time of his death.

According to police officers at the scene, defendant, who was then 19 years old, was hysterical, shaking, and crying when first contacted. She claimed to have hired Villanueva to do some work on her home. He attacked her with a knife and then sexually assaulted her. The officer recalled defendant's clothes had been wet and smelled of bleach. The officer saw bruises on each side of defendant's chest, one under her armpit, and another over her right eye. When asked if Villanueva lived with her, defendant said, "His stuff is in there."

3

Defendant and Allen were transported to the Palm Springs Police Department. Allen voluntarily gave a recorded statement to Palm Springs Police Sergeant Mike Kovaleff. At, Kovaleff's suggestion, Allen talked to defendant. Kovaleff escorted them to a room and left them alone, but he monitored and recorded their conversation without their knowledge.

During their conversation, defendant told Allen that Villanueva had "come on" to her while they were cleaning the bathroom. Villanueva repeatedly touched defendant even though she told him to stop. Eventually, Villanueva grabbed her and would not let go. They struggled for awhile before Villanueva pulled out a knife. Defendant said she pushed him away and tried to escape. Villanueva tried to hit her, but he missed and they both fell to the floor. Villanueva dropped the knife, which started a scuffle between them. Defendant retrieved the knife and stabbed Villanueva about two or three times.

At around 8:00 p.m., Palm Springs Detective Rhonda Long contacted defendant at the police station. Long advised defendant of her rights under *Miranda v. Arizona*, *supra*, 384 U.S. 436 and defendant gave a statement. Their conversation was also recorded and played at trial.

According to defendant, she met Villanueva in a Circle K parking lot in Cathedral City about a week before the stabbing. Villanueva was homeless and seemed like a "cool guy," so defendant hired him to do some work at her home. She also allowed him to sleep in her living room, and they smoked methamphetamine together. Defendant told police Villanueva had engaged in some inappropriate behavior a few nights earlier while he was tattooing her back, but she complained and he promised not to do it again.

On the morning of the stabbing, Villanueva spilled a lot of water as he tried to clean the bathroom. Defendant came into the bathroom to help Villanueva clean up the water, but he grabbed her and would not let go. During the ensuing struggle, they

4

both slipped on the wet floor. Defendant, frightened and angry, managed to free herself from Villanueva, but he chased her into the dining room.

Defendant said that Villanueva retrieved a knife and repeatedly thrust it at her while saying, "Come on." Defendant grabbed Villanueva's arm and pushed the knife away as they fell to the ground. She said Villanueva dropped the knife, which gave her a chance to grab it. She swung the knife at Villanueva and stabbed him two or three times. Defendant claimed she stabbed Villanueva more than once because he would not stop coming at her. She also told Long that Villanueva punched her in the forehead, and that he would have stabbed her had she not stabbed him first. She admitted taking a shower to wash off the blood after the stabbing. She also said she thought of calling 911, but her cell phone was in the car.

A criminalist analyzed blood evidence from the crime scene and tested blood samples from various locations in defendant's house. The criminalist testified Villanueva's blood was at every location they tested. In the criminalist's opinion, the blood evidence suggested an assault began in the bathroom, but the wound that severed Villanueva's carotid artery was most likely inflicted as Villanueva moved from the bathroom to the dining room. Due to defendant's sexual assault claim, technicians swabbed Villanueva's penis and found sperm cells, but not defendant's DNA.

*Defense Case*

The parties stipulated Villanueva had two prior felony convictions: a May 1998 conviction for unlawfully causing a fire (Pen. Code, § 452, subd. (b)), and a March 2004 battery against his then girlfriend, Veronica Lopez (Pen. Code, § 243, subd. (e)(1)).

Crystal Barnes, Villanueva's girlfriend in late 2004 and early 2005, testified they used methamphetamine daily, and Villanueva became more violent with increased drug use. Villanueva once brandished a knife and threatened to stab her. When Barnes became pregnant, he threatened to kick her in the stomach until either she or the baby

5

died. Barnes became frightened and had an abortion. She stayed with Villanueva for a while, but left as he used more methamphetamine and behaved more violently.

Finally, in 2005, Barnes moved away from Villanueva. When she went back to his apartment to collect her belongings, she became stranded and had to spend the night. Villanueva repeatedly said he wanted sex, but she declined. The following morning, she awoke to Villanueva raping her. Barnes testified she kept quiet during the rape because she wanted it to be over. When Barnes left for work, Villanueva grabbed her by the hair, knocked her to the ground, and pulled her feet first down some stairs. Although Barnes later reported the rape, she also told the police she did not want to prosecute because she was afraid of Villanueva. Eventually, she moved to Kansas.

Villanueva's mother testified she obtained a restraining order against him in November 2005. She wanted him to stop doing drugs, move out of her backyard, and get a job.

Clark Smith, a medical doctor specializing in addiction psychiatry testified methamphetamine is similar in effect to adrenalin, except that methamphetamine floods all nerve cells at once, creating a "rush" and widespread stimulation. A person who uses methamphetamine will react emotionally, rapidly, and unpredictably, and extended use can lead to paranoia and violent acts. In fact, users can be sexually aggressive and believe sex is consensual when it is not. Smith said the levels of methamphetamine and amphetamine found in Villanueva's blood was high enough to cause stroke, death, or psychosis. He also testified violent behavior after a single dose of methamphetamine is an indication of how that person will react to the drug in the future.

Harvey Dondershine, a clinical psychiatrist and expert on the effects of high stress situations, testified stress influences a person's perception of danger. Under stress, the chemicals released in the brain make a person more likely to engage in impulse-driven, defensive, and life-saving behavior. Afterward, the person can have difficulty remembering what happened, or misremember significantly stressful facts.

6

Based on a hypothetical question with facts mirroring the crime, Dondershine opined it would be typical for a person to remember stabbing someone 2 or 3 times while having actually stabbed them 11 or 12 times. Furthermore, a return to normal behavior, like house cleaning, would not be unusual. Dondershine also testified the person would probably have difficulty remembering what happened.

A forensic scientist analyzed the report prepared in conjunction with Villanueva's penile swab. According to the scientist, the sperm cells found on the swab could have been secreted during sexual arousal, but the number of sperm was more consistent with ejaculate than preejaculate fluid.

*Prosecution's Rebuttal Evidence*

A police officer testified that on June 8, 2012, defendant was a front seat passenger in a car he stopped. A search he conducted as a result of the traffic stop revealed that defendant possessed a stolen iPad that had been taken in a burglary about three months before the stop.

According to a videotape and a liquor store clerk victim's testimony, on June 10, 2012, defendant and two men entered a liquor store together. Within minutes, one of the men quickly returned to their car and started the engine. Defendant came around the counter and pushed the clerk to the ground. She then picked up the cash register and a DVD player and left the store. Defendant emptied the register drawer in the parking lot, and fled in the car.

Christa Stockman, defendant's best friend in 2007, testified that they once got into an altercation while under the influence of drugs. Stockman demanded defendant take her home, and defendant became enraged at the request. She repeatedly hit Stockman in the head and face. Stockman fled and contacted a police officer. However, at the time of trial, Stockman was on probation for domestic violence.

Dominick Libretti, defendant's cousin and a fellow methamphetamine user, reported to police that on one occasion, defendant bit him, came at him with a screwdriver, and accused him of trying to rape her.

The prosecution also called a staff psychologist at Patton State Hospital as an expert on the effects of stress and malingering. He said people in high stress events do not remember parts of an event and forget other parts of that event. In fact, the expert testified that difficulty remembering an event shows a person is malingering and changing the story for personal gain. According to the psychologist, punching oneself in the face after calling 911 shows malingering, as does inflicting multiple stab wounds, taking a shower, cleaning the house afterward, and telling different versions of the same event.

## DISCUSSION

*1. Evidence of Pending Felony Charges*

Defendant did not testify at trial. At the prosecution's request, the court admitted defendant's pretrial statements to Long and Allen. (Evid. Code, § 1220 [party admission].) At defendant's request, and over the prosecutor's objection, the court admitted Allen and defendant's statements to the 911 dispatcher. (Evid. Code, § 1240 [spontaneous utterance].) Recall Allen told the dispatcher defendant said the handyman attacked her with a knife. When the dispatcher asked to speak directly to defendant, defendant said a man attacked her and she was scared.

The district attorney then moved to introduce evidence of defendant's "acts involving moral turpitude" for impeachment purposes, citing Evidence Code sections 356 (whole of a writing or conversation admissible when necessary to make a part understood) and 1202 (statement or conduct by a declarant inconsistent with other statements or conduct admitted as hearsay evidence admissible for impeachment). The acts of moral turpitude specified in the motion were four pending criminal cases: (1)

8

June 2007 assault on Stockman; (2) April 2012 felony vandalism; (3) June 8, 2012 receiving stolen property; and (4) June 10, 2012 robbery.

The court admitted evidence of the Stockman assault under Evidence Code section 1103, subdivision (b) (victim's reputation for violence). The prosecutor withdrew his request to introduce evidence of the vandalism charge because the conduct amounted to a misdemeanor. That left the pending June 8, 2012 liquor store robbery and the June 10, 2012 receiving stolen property charges to consider.

Citing Evidence Code section 352, defendant claimed the prosecution failed to lay a sufficient foundation to admit evidence about the receiving stolen property charge, and further claimed presenting the facts of both cases would cause undue consumption of time and confusion of the issues. The prosecutor countered the admission of defendant's hearsay statements to Allen, Long, and the 911 operator made introduction of bad acts evidence "necessary to illuminate the credibility of [defendant]."

After extensive argument on the topic, the court ruled admissible evidence of defendant's pending felony robbery and receiving stolen property offenses for impeachment. (Evid. Code, § 1202 [credibility of hearsay declarant].) As noted above, the prosecutor introduced evidence of the robbery through a videotape and the testimony of the robbery victim, and evidence of the receiving stolen property charge through a police officer's testimony.

Defendant first argues the trial court abused its discretion by admitting evidence of pending felony robbery and receiving stolen property charges because charges are not convictions. As phrased by defendant, "[u]nder the plain language of California Constitution, [a]rticle I, [section] 28, subdivision (f)(4), [and] Evidence Code [section] 788, and [related] cases, the trial court erred when it permitted the prosecutor to introduce evidence of the conduct underlying the charges of robbery and receiving stolen property." Secondly, defendant claims evidence of the pending felony charges was

9

inadmissible because they involve conduct that occurred after she killed Villanueva. We disagree with both points.

"A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931, fn. omitted.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion. [Citations.]" (*Id.* at p. 932.)

Evidence Code section 1202 provides, in pertinent part, "Evidence of a statement or *other conduct* by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing." (Italics added.) "'Section 1202 creates "a uniform rule permitting a hearsay declarant to be impeached by inconsistent statements in all cases, whether or not the declarant has been given an opportunity to explain or deny the inconsistency." [Citation.] [¶] The purpose of section 1202 is to assure fairness to the party against whom hearsay evidence is admitted without an opportunity for cross-examination.' [Citation.]" (*People v. Curl* (2009) 46 Cal.4th 339, 361.)

Defendant concedes receiving stolen property and robbery involve acts of moral turpitude suggesting "a willingness to lie." (See *People v. Wheeler* (1992) 4 Cal.4th 284, 295-296.) She objects, however, because her pending cases had not yet resulted in felony convictions, and she cites and discusses several cases in her favor. However, these cases predate the passage of Proposition 8. After Proposition 8, a felony

10

conviction is no longer required for impeachment evidence. (*People v. Wheeler, supra,* 4 Cal.4th at pp. 291-294.)

Furthermore, while "a misdemeanor offense or other misconduct not amounting to a felony is less probative of moral turpitude or dishonesty than is a felony" (*People v. Clark, supra,* 52 Cal.4th at p. 932), Evidence Code section 1202 applies to acts involving moral turpitude, not only evidence of prior felony convictions. (*Id.* at p. 933.) The *Clark* court noted the difficulties with admitting "impeachment evidence other than a felony conviction," i.e., problems of proof, undue consumption of time, or possibility of confusion. (*Ibid.*) But here, defense counsel's objection alerted the court to this possibility before its ruling, and the court rejected it when making its ruling.

Defendant fares no better arguing any acts of moral turpitude committed after the homicide are inadmissible. First, she admits there are no cases supporting her position, and we have found no authority to limit impeachment evidence in this way. In fact, defendant's argument seems to stem from a misunderstanding. The term prior conduct means prior to the trial, not prior to the commission of the underlying crime. (See *People v. Mickle* (1991) 54 Cal.3d 140, 167-168 [evidence witness wrote threatening letters while incarcerated admitted for impeachment].)

Excluding impeachment evidence solely because the act of moral turpitude occurred *after* the crimes for which defendant stands trial would be an arbitrary and unreasonable limitation on the ability of the parties to test a testifying defendant's credibility. As we explained, defendant sought admission of her hearsay statements to the 911 operator at trial. The prosecutor was thus entitled to challenge defendant's credibility as a hearsay declarant at trial with otherwise admissible prior acts involving moral turpitude. That is the essence of Evidence Code section 1202.

However, assuming error, the evidence of the conduct underlying the pending felony charges was hardly the most formidable challenge to defendant's credibility. Her story seemed to change with the telling, and she admitted heavy

11

methamphetamine use around the time she killed Villanueva. In particular, her conduct immediately after the crime does not align well with her claim of self-defense. While the parties' experts disagreed on the potential effects of stress and drugs on the actions and perceptions of defendant and Villanueva, the facts suggest defendant took a shower and cleaned her house while Villanueva bled to death in her dining room.

Furthermore, the court gave a limiting instruction that stated, "If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable. [¶] It is alleged that the defendant committed a robbery and received stolen property. If you find it more likely than not that she committed these crimes, you may, but are not required to, consider that evidence when evaluating the defendant's credibility. You may not use this evidence for any other purpose." (CALCRIM No. 316.)

CALCRIM No. 316 correctly told the jurors evidence of defendant's pending felony charges was relevant solely to her credibility, and we presume the jury followed this instructions. (*People v. Gray* (2005) 37 Cal.4th 168, 217; *People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) In light of the facts adduced at trial, any error in admitting evidence of defendant's pending felony charges for impeachment was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Fuiava* (2012) 53 Cal.4th 622, 671, *People v. Cudjo* (1993) 6 Cal.4th 585, 611.

*2. Miranda*

As noted, defendant talked to Long while in custody at the Palm Springs Police Department. Defendant contends the court violated *Miranda* and committed reversible error by admitting her statement to Long. According to defendant, she invoked her right to counsel, but Long told her no attorney was available. In addition, she insists

12

Long had a duty to repeat the *Miranda* advisement 30 minutes later when defendant asked to speak to Long. We disagree.

"'On review of a trial court's decision on a *Miranda* issue, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda.*' [Citation.]" (*People v. Hensley* (2014) 59 Cal.4th 788, 809.) We conclude defendant's claims are meritless.

The court conducted an Evidence Code section 402 hearing and the following evidence was adduced. According to Long's testimony and the transcript from the interview, defendant had been placed in handcuffs and left in a room when Long joined her. After some preliminary chatter, Long repeatedly told defendant she needed to read her rights. Eventually, Long got out, "You have the right to remain silent. Do you understand?" Two pages of transcript and several nonresponsive answers later, defendant acknowledges her right to remain silent. Long then tells defendant, "anything you say . . . could be used you [*sic*] in a court of law. Do you understand?" Defendant replied, "That you're gonna (ph) use this against me?" Long clarified "[i]t could be used against you," and defendant replied that she understood that right.

After Long told defendant she had the right to an attorney present during the interview, defendant said, "Oh, I can have him present?" Long responded, "It-it-it's the right that you can have, but . . . I can't have him here, you know just-yet, but it's a right that you could have." Long repeated the admonishment about having an attorney. She asked defendant, "[d]o you understand that?" Defendant made no audible response, but when Long said, "[j]ust let me know if you understand 'em[,]" defendant replied, "Yeah, I understand." Long said, "if you can't afford to hire an attorney, one will be appointed to represent you." Defendant said she understood. Defendant volunteered to sign "it," but Long said "well, you're handcuffed right now." Long asked, "you understand all of those rights?" Defendant said, "Yeah, I wanna (ph) wait."

13

The next few pages of transcript reveal Long repeatedly advised defendant of her right to an attorney, but also telling defendant that if she wanted an attorney present, she would have to wait. In one such instance, Long told defendant, "It's your right. If you decide that you wanna speak to me, okay? You have to . . . let the jail know that you wanna[] have me come talk to you, okay? Cuz . . . we're done talking right now." In short, Long terminated the interview after defendant invoked her right to counsel. However, about 30 minutes later, defendant contacted jail personnel and let them know she wished to speak to Long. When Long talked to defendant this time, defendant gave her recorded statement of how she came to know Villanueva, his attack, and the aftermath.

After the Evidence Code section 402 hearing, the court found Long properly advised defendant of the right to an attorney and questioning would stop if she wanted one. As the court noted, "[defendant] had every opportunity in the world to take the position, I do not want to talk anymore." The court concluded, "while it may not have been perfect in its form, in one continuum, within very short order, within a very short period of time [Long] did, in fact, in my opinion, cover all the bases in terms of what it was that she needed to do [under *Miranda*]." We agree.

Long told defendant she had the right to remain silent, the right to have an attorney at no expense, and that anything she said could be used against her. Defendant said she understood her rights and then invoked her right to counsel by saying: "Okay, I want my attorney." Contrary to defendant's view, Long's advisement of rights was not deficient or contradictory. Defendant frequently interrupted Long, but Long adequately explained each *Miranda* right and defendant responded that she understood her rights. That is sufficient.

Defendant's second complaint that Long should have repeated the *Miranda* warning before questioning her 30 minutes later fares no better. The record reflects defendant told jail personnel she wanted to speak to Long. Long entered the interview

14

room and asked defendant if she wanted to talk. Defendant said she wanted to talk and explained that she was now feeling calmer. Long got defendant a drink, and then defendant told her story. There was no error.

True, all questioning must cease once a request for counsel is made (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485), but Long followed this rule. When an accused who invokes his or her right to counsel later gives a statement, courts may admit any responses to further questioning only on finding the accused (a) initiated further discussions with the police, and then (b) knowingly and intelligently waived the right he had invoked. (*Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1046.) Whether the accused has made valid waiver "depends in each case 'upon the particular facts and circumstances surrounding that case, including background, experience, and conduct of the accused.'" (*Edwards v. Arizona, supra,* 451 U.S. at p. 482.)

Here, Long explained defendant's *Miranda* rights. Defendant acknowledged each right and said she understood her rights. She asked for an attorney and Long ceased questioning and released defendant to jail personnel. After about 30 minutes, defendant told the jail personnel she wanted to talk to Long. In light of the fact Long fully advised defendant of her *Miranda* rights less than an hour before, a reasonable inference is defendant still understood her rights. Furthermore, we have reviewed the transcript of the interview. Nothing in the transcript demonstrates Long coerced, threatened, or made any promises to defendant, nor is there any other evidence to suggest defendant's statement was no voluntarily made. In short, the record amply supports the court's implied finding defendant reinitiated contact with Long 30 minutes after receiving a valid *Miranda* warning.

Defendant cites *United States v. Perez-Cruz* (9th Cir. 2003) 348 F.3d 839. However, in that case, the police officer told the defendant in Spanish that he had a right to "'solicit'" the court for an attorney. The appellate court found the officer's statement did not adequately convey the government's obligation to appoint an attorney free of

15

charge to indigent defendants. (*Id.* at p. 848.) Here, Long's advisement adequately explained defendant's right to counsel, right to appointed counsel, right to remain silent, and the possibility any statements would be used against her at trial. Long had no duty to restate these rights 30 minutes later simply because defendant asked to talk to her.

*3. Jury Instructions*

The trial court instructed the jury on the general principles of homicide (CALCRIM No. 500), first degree murder with premeditation and deliberation (CALCRIM Nos. 520, 521), express and implied malice in first degree murder (CALCRIM No. 520), the lesser included offenses of second degree murder (CALCRIM No. 520), voluntary manslaughter (CALCRIM No. 571 [imperfect self-defense]), and justifiable homicide based on perfect, or lawful, self-defense (CALRIM No. 505).

On appeal, defendant argues the version of CALCRIM No. 505 given by the court deprived her of the constitutional right to present a defense and to a fair trial. As given, CALCRIM No. 505 stated, in pertinent part, "The defendant is not guilty of murder if (he/she) was justified in killing someone in self-defense." The pattern instruction states: "'The defendant is not guilty of (murder/ [or] *manslaughter*/ attempted murder/ [or] attempted voluntary manslaughter) if (he/she) was justified in (killing/attempting to kill) someone in (self-defense/ [or] defense of another)." (Italics added.) As the italicized language makes clear, self-defense applies to voluntary manslaughter, murder, attempted murder, and attempted voluntary manslaughter. The court did not include the word manslaughter and it would have been appropriate here.

16

The Attorney General seems to agree the court erred, but asserts the error was harmless. We find no error.[1]

An appellate court independently assesses "whether instructions correctly state the law." (*People v. Posey* (2004) 32 Cal.4th 193, 218)  We review the adequacy of instructions asking whether "the trial court 'fully and fairly instructed on the applicable law.' [Citation.]" (*Ramos*, *supra*, 163 Cal.App.4th at p. 1088.)  The determination of error requires us to "'"consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.]  'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*Ibid.*)

As defendant admits, no case addresses her precise point.  Instead, she analogizes this case to those involving the failure to instruct on an essential element of the crime.  But accepting that analogy, "'"[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial." [Citation.]  "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." [Citation.]' [Citations.]" (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1499.)

Under established rules of appellate review, we must consider CALCRIM No. 505 in light of other pertinent instructions, with a bias toward an interpretation consistent with the judgment.  CALCRIM No. 500 as given stated, in pertinent part, "Homicide is the killing of one human being by another.  Murder and Manslaughter are

---

[1] The Attorney General argues defendant forfeited this issue.  The parties agree defense counsel submitted two written requests for CALCRIM No. 505, one of which included the optional manslaughter language, so there was no forfeiture.  Moreover, "we may review any instruction which affects the defendant's 'substantial rights,' with or without a trial objection. [Citation.]" (*People v. Ramos* (2008)163 Cal.App.4th 1082, 1087 (*Ramos*).)

17

types of homicide. . . . [¶] *A homicide can be lawful or unlawful. If a person kills with a legally valid excuse or justification, the killing is lawful and he or she has not committed a crime.* If there is no legally valid excuse or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter." (Italics added.) The highlighted language told the jury murder and manslaughter are homicides, and if they found defendant had a valid excuse or justification when committing a homicide, the verdict should be not guilty.

CALCRIM No. 571 told the jury voluntary manslaughter is a lesser included offense of murder, and "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because she acted in imperfect self-defense. [¶] *If you conclude the defendant acted in complete self-defense, her action was lawful and you must find her not guilty of any crime*. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable." (Italics added.) Again, this instruction told the jury self-defense applied to murder and manslaughter.

If we assume, as we must, that "'the jurors [were] intelligent persons and capable of understanding and correlating all jury instructions . . . given,' [citation]" (*People v. Yoder, supra,* 100 Cal.App.3d at p. 338), then we must conclude the instructions, taken as a whole, adequately informed the jury self-defense applied to manslaughter. Furthermore, the instructions, taken as a whole, repeatedly told the jurors to acquit defendant of all charges if they concluded she acted in self-defense.

In sum, the court's failure to include the word manslaughter in CALCRIM No. 505 did not deprive defendant of her ability to present a defense, nor did it result in an unfair trial. Defendant presented ample evidence in support of her self-defense claim, to a fair and impartially selected jury. As defendant points out, the jury deliberated for nearly 14 hours over three days. Defendant argues this means the homicide instructions were in conflict and fatally flawed. But we fail to see the conflict, and the length of

18

deliberations is not necessarily proof the jury misunderstood an instruction. The time the jury considered defendant's case also suggests careful consideration of the evidence. In conclusion, although the court did not adopt defendant's requested modification to CALCRIM No. 505, and it would have been proper to do so, when considered in light of the whole charge the court's instructions on self-defense and homicide were adequate.

*4. Sentencing*

The probation report prepared for defendant's sentencing listed two aggravating factors related to the crime and one aggravating factor with respect to defendant. With respect to the crime, the report cited great violence, great bodily harm, or acts disclosing cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421(a)(1)) and use of a weapon (Cal. Rules of Court, rule 4.421(a)(2)) as aggravating factors. With respect to defendant, the report listed the fact she had engaged in violent conduct as an indication she posed a serious danger to society (Cal. Rules of Court, rule 4.421(b)(1)). There were no mitigating factors related to the crime, and the report mentions only defendant's relatively minor criminal record as a factor in mitigation with respect to her, although the judge did mention her youth as an additional factor in mitigation at the sentencing hearing.

The court relied on both the nature of the crime and the use of a knife to impose the upper term for manslaughter and the one-year term for use of a weapon. Defendant argues neither factor may be relied upon. Defendant concedes her attorney did not object at sentencing, and she acknowledges that an objection is required to preserve these issues on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 353.) Consequently, she makes the alternative claim her attorney provided ineffective assistance of counsel by failing to object. We reach the merits of defendant's claims in an effort to determine if there was error, and whether any error caused prejudice.

With respect to use of a knife as an aggravating factor, she argues the court erred by using this fact to impose both an aggravated sentence for voluntary

19

manslaughter *and* the one-year for an enhancement based on use of a knife. The Attorney General concedes the court's reliance on this factor constitutes an improper dual use of fact. However, the Attorney General also points out the court relied on great violence, cruelty, or callousness of the crime to impose the aggravated term for voluntary manslaughter (Cal. Rules of Court, rule 4.421(a)(1)), emphasizing that a single aggravating fact justifies the imposition of an upper term. (*People v. Osband* (1996) 13 Cal.4th 622, 728.) We agree with the Attorney General.

The court stated, "what was really striking . . . as we moved into trial, was to think that what happened – 12, 13 stab wounds or however many there were – violent stab wounds, significant cuts on the human body or victim in this case – the testimony was that based upon the number of stab wounds the victim in this case probably died within a two-minute period of time. That's how bad things were and how significant the event was. [¶] . . . [¶] Number two, when it was discovered that the event had occurred, the evidence reflected that [defendant] took the time after the event to take a shower and wash the blood off. She took the time to take a bucket with bleach and a mop to clean up the bathroom and make it virtually speck free from blood."

Defendant believes "[t]he infliction of the [12] stab wounds involved violence, but it was only an average amount of violence, not great violence." She relies on the pathologist's testimony the infliction of 12 wounds was not unusual in a stabbing case. While that may be true, the number of wounds was not the whole story. The court also focused on the severity of the wounds, noting that it took Villanueva less than five minutes to die. Furthermore, the court found the fact that defendant made no effort to call 911, instead taking time to clean herself and her home, demonstrated extreme callousness and disregard for human life. The evidence supports the court's finding in this regard. (See *People v. Zamaroon* (1994) 30 Cal.App.4th 865, 872.)

When reviewing the trial court's exercise of its broad sentencing discretion, "Our function is to determine whether the respondent court's order is arbitrary or

20

capricious, or "'exceeds the bounds of reason, all of the circumstances being considered."
[Citation.]'  The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.  [Citations.]" (*People v. Superior Court* (*Du*) (1992) 5 Cal.App.4th 822, 831-832.)

Defendant fails to sustain her burden of proving the court acted irrationality or capriciously by imposing the aggravated term for voluntarily manslaughter.  Thus, we find no abuse of discretion in the court's reliance on California Rules of Court, rule 4.421(a)(1) to impose the aggravated 11-year term for voluntary manslaughter.  To the contrary, the court's imposition of the upper term was a reasonable exercise of its sentencing discretion.

## DISPOSITION

The judgment is affirmed.

THOMPSON, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

IKOLA, J.

21