Filed 7/7/25  P. v. Regalado-Mandujano CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GONZALO REGALADO-MANDUJANO, JR.,<br><br>        Defendant and Appellant. | A166546<br><br>(Contra Costa County<br>Super. Ct. No. 04002000974) |

A jury found defendant Gonzalo Regalado-Mandujano, Jr. guilty of multiple counts of unlawful sexual penetration of a child and lewd conduct with a child.  On appeal, he contends the trial court should have excluded incriminating statements he made during a police interview because he was given a flawed Spanish translation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  Defendant further contends the trial court should have granted his motion for a mistrial after the prosecution belatedly disclosed material information regarding the victim's suicide attempt, behavioral issues, and other facts regarding the allegations of abuse.  Finally, defendant argues the trial court abused its discretion by ordering him to pay $750,000 in noneconomic restitution to the victim.  We affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND[1]

A first amended information charged defendant with committing the following crimes against Jane Doe ("Doe") between July 2010 and July 2012: sexual penetration with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b)[2]; counts one, two, and three); and lewd and lascivious act upon a child under 14 years of age (§ 288, subd. (a); counts four, five, and six). Aggravating circumstances were alleged as to each of the charged crimes (Cal. Rules of Court, rule 4.421(a)): one aggravating circumstance was alleged as to defendant (*id.*, rule 4.421(b)), and other aggravating circumstances were alleged to apply to the charged crime or defendant (*id.*, rule 4.421(c)).

The evidence at trial included the following. Doe was born in 2003. Her mother, Norma,[3] is defendant's aunt. In or around 2010, Doe lived with her parents and two siblings in Brentwood, and defendant regularly visited their home. Doe's parents often relied on defendant to drive their daughter to school and soccer practice.

In the summer of 2010, defendant, then an adult, took seven-year-old Doe into a guest room in her home. He took off Doe's pants, put his fingers inside her vagina for a few minutes, momentarily removed them, and reinserted them. He then pointed at his lap to indicate he wanted Doe to sit on it. Doe was confused and did not understand what was happening.

On a second occasion in the summer of 2010, Doe's family invited defendant and other family members to their home. Defendant again took

---

[1]  Additional background facts are set forth in the relevant sections of the Discussion, *post*.

[2]  Further unspecified statutory references are to the Penal Code.

[3]  We use the first names of Doe's family members to easily distinguish them from one another and to protect the victim's privacy.

seven-year-old Doe into the guest room alone, took off her pants, and inserted his fingers into her vagina for about a minute.

During another incident in 2010, defendant picked Doe up from soccer practice. While in the car, he placed his hand on her thigh and moved it underneath her shorts. Doe stopped defendant's hand before he reached her vaginal area. Defendant became angry and told Doe not to tell her parents about what had occurred. A similar incident took place again in the car after a soccer practice in which defendant touched Doe's legs but did not touch her vaginal area.

On another occasion at a community swimming pool, Doe slipped and hurt her chest. When defendant asked to see her chest, Doe said " 'no.' " Defendant pulled on the top of Doe's swimsuit, but she walked away.

Doe was afraid of defendant and worried he would retaliate against her if she told anyone what he had done. At the time of the offenses, she had not yet received any education about her body or sex education.

In December 2012, when Doe was nine years old, defendant moved to Mexico. Though Doe was relieved she would not have to see him again, she was sad her parents still liked defendant and did not know the "real him."

From 2010 to 2017, Doe's mother observed that Doe was happy and would spend time playing with her cousins. In 2017, when Doe was 14 years old, she and her family attended a baptism in Mexico and saw defendant. Defendant said hello to Doe and her family and shook Doe's hand. Doe felt shocked, scared, and disgusted to see defendant again, and she stayed near her mother to avoid him.

After returning to California, Norma noticed changes in Doe's behavior. Doe was depressed, not eating, did not want to go to school, and began to engage in self-harm. She often isolated herself in her room all day and

stopped playing soccer and doing other things with her brothers. Additionally, Doe counted her calorie intake, often drank only water, and weighed herself constantly. Norma also noticed scars on Doe's arms and legs. Norma was alarmed by Doe's behavior and talked to her pediatrician. Doe was referred to a therapist and a specialist for an eating disorder in 2017.

In September 2019, 16-year-old Doe tried to commit suicide by slitting her wrist because she "couldn't take everything else going on in [her] life no more." Afterwards, Doe went to school as if nothing had happened, but her teachers saw her injuries and called an ambulance. Doe was hospitalized and subsequently transferred to a psychiatric facility. A nurse asked Doe why she tried to commit suicide and whether she had ever been sexually abused, and Doe reported that her cousin had sexually abused her. Doe felt better after reporting the abuse.

Brentwood Police Officer Devin Hidalgo received a dispatch that a juvenile had been admitted to a facility for a psychiatric hold, and that she told a nurse her adult male cousin had sexually assaulted her when she was seven years old at a residence in Brentwood. Hidalgo was unable to make contact with the nurse, but he verified that a young woman with Doe's name lived at the Brentwood address, and that a person with defendant's name lived in the same area. Hildalgo forwarded his report to the department's investigations division.

Brentwood Police Detective Joseph Nunemaker arranged for Doe to be interviewed at the Children's Interview Center (CIC). The audio recording of that interview was played for the jury. During the interview, Doe said her cousin "Gonza" had sexually assaulted her two or three times when she was seven years old. During the first incident, defendant pulled down her pants in a guest room and touched her thighs and vagina and put his finger in her

4

vagina. He stopped when he heard Doe's mother in the hallway. He subsequently molested Doe a second time in the guest room. When defendant drove Doe to soccer practice, he touched her thighs, and she told him to stop.

Detective Nunemaker attempted to locate defendant but was initially unsuccessful. In August 2020, Nunemaker was alerted that defendant had been arrested in Kansas, and he traveled to Kansas to interview defendant. The interview was conducted in Spanish. The jury heard an audio recording of the interview and received a written English translation. During the interview, defendant told Nunemaker he was 30 years old and lived in Kansas, where he worked at a slaughterhouse. He had a daughter who lived in Mexico with her mother.

Before questioning defendant about Doe, Nunemaker read defendant a Spanish translation of *Miranda* advisements, and defendant stated he understood what Nunemaker had read. Defendant then told Nunemaker he believed he had been arrested because he "touched a person who is my cousin." Defendant admitted he had touched Doe's vagina skin-to-skin with his hand at her family home. He further admitted he had inserted his finger into Doe's vagina one time. Defendant confessed to touching Doe two or three times but claimed he was 16 or 17 years old at the time. (At trial, Nunemaker clarified that defendant was 19 and 20 years old in 2010.) Defendant told the detective he did not know what he was thinking when he did it, and said he felt horrible about it. He asked Nunemaker to tell Doe and her parents he was sorry. On Nunemaker's suggestion, defendant wrote a letter of apology to Doe, and Nunemaker read an English translation of defendant's apology letter to the jury.

The jury found defendant guilty on all six counts. On the prosecutor's motion, the trial court dismissed the aggravating circumstance allegations.

5

The court sentenced defendant to a total of 30 years to life in state prison. Defendant was ordered to pay $750,000 in noneconomic damages to Doe. This appeal followed.

## DISCUSSION

### A. Spanish Translation of *Miranda* Warnings

Defendant first contends the trial court erred in denying his motion to exclude the incriminating statements he made to Detective Nunemaker.  We find no error.

#### 1. *Additional Facts*

Defendant moved in limine to exclude the incriminating statements he made during the interview with Detective Nunemaker on the ground that the detective's flawed and garbled Spanish translation of the *Miranda* warnings failed to properly advise that if defendant did not have the financial means to hire an attorney, an attorney would be provided to him at no cost.  In support of the motion, defendant submitted the report of Haydée Claus, a state and federally certified Spanish court interpreter, identifying various errors made by Nunemaker.

Claus translated Nunemaker's remarks as follows, with blank spaces corresponding to what Claus called "serious errors affecting meaning":  "If you don't have the financial availability to ____ an attorney, one will be ____ to you for him to represent you before any questioning."  The first blank sounded to Claus like " '*contraar*,' " which is not a Spanish word, and could be construed by a listener to mean " '*encontrar a un abogado*' ('to find an attorney')]" or " '*contratar a un abogado*' ('to hire an attorney')," or might simply confuse the listener altogether.  The second blank sounded to Claus like "uno se te hará asignado," which translates to the grammatically incorrect phrase " 'one will be made assigned to you.' "

Additionally, Claus identified what she called "medium-level errors possibly affecting meaning" (e.g., Nunemaker's pronunciation of "porque" as "porqué," which changed the meaning from "given that you're here in the jail" to "how come you're here in the jail"); pronunciations that may be difficult to understand by Spanish speakers in Latin America; and grammatical errors "mixing formal and informal forms of address" (e.g., "usted" rather than "tu") that "may create uncertainty/discomfort" or "affect comprehension."

At an evidentiary hearing on the motion, Detective Nunemaker testified he was fluent in Spanish and spoke it daily when he lived in Spain for two years. He also worked as an internal Spanish translator for two police departments. Nunemaker acknowledged that he spoke Spanish with a Castilian accent.

During the Kansas interview with defendant, Nunemaker read defendant his *Miranda* rights from a card written in Spanish.[4] Nunemaker did not know who wrote the translation, but it was not issued by the District Attorney's Office. Nunemaker testified he read the word, "contratar," which means "to hire" (e.g., "If you don't have the financial availability to hire an attorney"), but he acknowledged after listening to the audio that the word was "not clear," and that the second "t" was not heard on the recording. According to Nunemaker, defendant indicated he understood the advisements by saying " 'mm-hmm' " and nodding affirmatively, but Nunemaker acknowledged the audio recording did not pick up all of defendant's responses. According to Nunemaker, defendant never expressed lack of understanding, appeared to understand everything, and made eye contact

---

[4] The card, entitled "MIRANDA WARNING IN SPANISH," stated in relevant part, "Si no tienes la disponibilidad economica para contratar a un abog[a]do, uno se te sera asignado para que te represente antes de algun interrogatorio."

7

during the interview. Towards the end of the interview, defendant told Nunemaker that his Spanish was "very good."

Ana Carlos, a case assistant at the District Attorney's Office, testified for the prosecution. Born and raised in Mexico, Carlos was a native Spanish speaker and had listened to the audio recording of the interview with defendant more than 10 times. Carlos testified that what she heard on the audio recording translated as follows: " 'If you don't have the financial availability to hire an attorney, one will be provided to you before questioning.' " Carlos acknowledged, however, that Nunemaker did not pronounce the "t" in the word "contratar," and that she did not hear an audible response from defendant as to whether he understood that right.

Claus testified as an expert for the defense. She opined that Nunemaker's mispronunciation of the word "contratar" made the statement "garbled," "not intelligible," and "not clear at all," and that the complete absence of a "t" made it a nonexistent word in Spanish. Claus further testified that if the word was understood as "encontrar," it would mean to "find rather than hire," and that Nunemaker's statement that an attorney " 'will be made assigned to you' " was "muddy" and "unclear."

Claus acknowledged she did not hear defendant expressing a lack of understanding during the interview. Notably, she also testified that even the way she translated the *Miranda* warning referenced a person's financial availability for an attorney. She further agreed that "[i]f you make the grammatical leap," then the second part of the sentence states that an attorney can be assigned to you before questioning.

The trial court remarked that in listening to the audio recording of the interview, it heard neither "contratar" nor "contraar," but "contraars" or "tars," and thus, the court would not "consider the words that are translated

8

'to hire' because I did not hear that. I heard the mispronunciation." The court further remarked it did not hear the phrase that Claus had translated to the grammatically incorrect phrase " 'uno se te hará asignado,' " and instead, the court "heard what was actually on or close to" what was written on the Spanish translation of the *Miranda* advisements (e.g., "uno se te sera asignado"). The court found little significance in Nunemaker's "medium-level" errors (e.g., " 'how come you're here in jail' " rather than " 'given that you're here in jail' "; "in court" rather than "in a court of law"). The court also found the meaning from the advisements was "clear" that "you don't have to have money to have a lawyer," and the court credited Nunemaker's testimony that defendant appeared to understand each of his rights. The court concluded that "even if the grammatically flawed sentence imperfectly conveyed the idea of the county or the state providing an attorney for the defendant in the context of a right to have an attorney during the questioning, and the inability of the defendant to pay for one, the idea that one would be assigned to him without him having to pay . . . sufficiently conveyed the concept of appointment." Finding that defendant knowingly and intelligently waived his rights, the court refused to exclude the incriminating statements from the interview.

### 2. *Analysis*

"*Miranda* requires that an individual who is subjected to custodial interrogation must be first advised, among other things, that 'if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' [Citation.] The purpose of this particular advisement is to 'convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present." [Citation.] In order to make clear to an indigent that this right is owing to him, there must

9

be an 'effective and express explanation' of the right." (*People v. Diaz* (1983) 140 Cal.App.3d 813, 822 (*Diaz*).) The essential inquiry is whether the advisements reasonably convey to a suspect the rights as required by *Miranda* (*People v. Wash* (1993) 6 Cal.4th 215, 236–237), and no "talismanic incantation" is required (*California v. Prysock* (1981) 453 U.S. 355, 359; *Diaz*, at p. 822). "In reviewing defendant's claim that his *Miranda* rights were violated, we must accept the trial court's resolution of disputed facts and inferences, as well as its evaluation of the credibility of witnesses where supported by substantial evidence." (*People v. Cruz* (2008) 44 Cal.4th 636, 667.)

The precise issue raised by defendant is whether he was effectively advised of his right to appointed counsel at no cost in the event he could not afford one. The trial court explicitly found that in reading from the *Miranda* translation card, Nunemaker mispronounced the Spanish word "contratar" (to hire), but that he pronounced the subsequent phrase "uno se te sera asignado" consistent with the card. Essentially then, defendant was advised that if he did not have "financial availability" in some unclear aspect with regard to "an attorney," "one will be assigned to" him "before any questioning."

In our view, the totality of the circumstances supports the trial court's conclusion that the translation was sufficient for defendant to make a knowing and intelligent waiver of his right to appointed counsel. Even if Nunemaker's garbled pronunciation "contraar" could not be understood as either "contratar" (to hire) or "encontrar" (to find), then at worst, it conveyed no meaning at all. But this single deficiency did not remove all meaning from the rest of the sentence. Significantly, just before receiving the challenged advisement, defendant was told, "You have the right to talk with an attorney

10

and for him to be present with you when you are interrogated." He was then told that if he did not have "financial availability," an attorney "will be assigned to him" prior to questioning. Viewed in context, the point was effectively made that defendant had the right to legal counsel before being interrogated even if he could not afford one.

*Diaz* does not cause us to conclude otherwise. There, the *Miranda* translation stated, " '[if] you cannot *get* a lawyer, one can be named before they ask you questions.' " (*Diaz*, *supra*, 140 Cal.App.3d at p. 822.) The words used in that instruction contained no reference whatsoever to the defendant's financial means to obtain legal counsel. Indeed, the People conceded in *Diaz* that the defendant was not explicitly informed of his right to appointed counsel if he could not afford one, and instead argued the word " 'conseguir' (meaning 'to get' or 'to acquire') conveyed to appellant that an attorney would be appointed for him if he was indigent." (*Ibid*.) The court rejected this argument, highlighting that two certified Spanish language interpreters testified at the suppression hearing that "the Spanish language version used in this case does not state or advise that if a person cannot *afford* a lawyer one will be appointed for him." (*Id*. at p. 823.) Here, in contrast, the *Miranda* translation expressly stated that defendant would be "assigned" an attorney if he lacked "financial availability." Thus, the translation addressed the key issue of appointment of counsel in the event of financial need.

Defendant's reliance on *United States v. Botello-Rosales* (9th Cir. 2013) 728 F.3d 865 (*Botello-Rosales*) and *United States v. Perez-Lopez* (9th Cir. 2003) 348 F.3d 839 (*Perez-Lopez*) fares no better. In *Botello-Rosales*, the detective told the defendant in Spanish that he could be given a lawyer "who is free" but used the word " 'libre' to mean 'free,' " which did not mean "without cost," but rather, " 'free' as in being available or at liberty to do

11

something." (*Botello-Rosales*, at p. 867.)  As the court explained, this translation error improperly suggested that the right to appointed counsel was "contingent on the approval of a request or on the lawyer's availability, rather than the government's absolute obligation."  (*Ibid.*)  In *Perez-Lopez*, an interpreter told the defendant in Spanish, "you have the right to solicit the court for an attorney if you have no funds."  (*Perez-Lopez*, *supra*, 348 F.3d at p. 847.)  The court held the warning did not sufficiently convey "the government's obligation to appoint an attorney for indigent accused" because "[t]o be required to 'solicit' the court . . . implied the possibility of rejection." (*Id.* at p. 848.)

Here, Nunemaker's recitation of the *Miranda* warnings in Spanish, though flawed as to his pronunciation of the word "contratar," did not convey a materially different meaning that served to undermine an effective advisement of defendant's right to appointed counsel (e.g., "libre" in *Botello-Rosales* or "solicit" in *Perez-Lopez*).  That is, the mispronunciation did not change the meaning of the advisements that were otherwise adequately conveyed.  Resisting this conclusion, defendant argues that the phrase "financial availability" was awkward,  and that the advisement that an attorney would be "assigned" to defendant did not adequately convey that the attorney would be provided for free.  But the implication that defendant would be assigned an attorney at no cost flows naturally from the conditional phrase directly preceding it, "if you don't have the financial availability." Even if "financial availability" was an awkward phrase, it still effectively conveyed the idea that an attorney would be assigned to defendant if he lacked the available funds to obtain one himself.  Indeed, defendant's expert Claus acknowledged that she herself references a person's financial availability for an attorney in the way she translates the *Miranda* warning.

12

Finally, defendant argues the inadequacy of the *Miranda* advisement here is bolstered by Nunemaker's "myriad grammar and pronunciation errors." As discussed above, these errors involved pronunciation errors on various statements and errors regarding formal and informal forms of address in Spanish. We are not persuaded that any of these errors materially impacted defendant's understanding of his rights under *Miranda*. Our conclusion is supported by the evidence that defendant indicated he understood his rights, did not ask for clarification of the meaning of any words, and asked no questions about his rights during the interview. We also defer to the trial court's finding that Nunemaker credibly testified defendant appeared to understand what he was told.

For all of these reasons, we conclude the trial court properly denied the motion to exclude defendant's incriminating statements.

## B. Motion for Mistrial Based on Prosecutorial Discovery Violations

Defendant next contends the trial court erroneously denied his motion for a mistrial after the prosecution disclosed, on the day of opening statements, detailed information regarding the victim's suicide attempt, behavioral issues, and other facts regarding the allegations of abuse. Defendant insists the discovery violation precluded the defense from preparing properly to confront the evidence about Doe's suicide attempt and behavioral symptoms of depression. For the reasons that follow, we find no error or abuse of discretion.

### 1. Additional Background

After a midday break in the testimony of the first witness (Norma), defense counsel moved for a mistrial claiming the prosecution had not met its discovery obligation to timely disclose material information to the defense. Specifically, defense counsel indicated she had just received from the

prosecutor "a full page" statement from Doe containing information about "the location of the first touching, more statements about what had happened at the pool, . . . a statement that [defendant] was always asking Doe to sit on his lap, a statement about Doe not knowing what her vagina was or what it was called, a full statement about what had happened in the baptism, broader explanations about self harm, cutting herself, not eating, including the tools that she used to cut herself, suicide attempts, and conversations with the nurse." Defense counsel argued that the late disclosure was prejudicial because it changed her "perspective, approach and strategy with regards to cross-examination."

The prosecutor accused defense counsel of "making a big to-do about this." He explained that most of his pretrial conversations with Doe and her family were about planning, plea negotiations, and the court process, and that the reason he did not interview Doe earlier is because he did not want to subject her to "further trauma of sitting down with a stranger and interviewing her point by point." But when the prosecutor emphasized the law did not require him to depose the witnesses prior to trial, the court responded it had observed a pattern and practice of the Contra Costa District Attorney's Office "where they wait until the witness stand, or the day the witness is called, and hide behind the argument that no case requires an actual interview."

The prosecutor insisted that Doe had not changed her testimony in any way, and that she had simply explained a few details about matters that had not yet been asked by the police or the CIC interviewer. As an example, the prosecutor stated, "We knew she was 5150'd"—a reference to the involuntary psychiatric hold statute, Welfare and Institutions Code section 5150—and "we know it's for psychological reasons. We knew that there were suicidal

14

ideations.  We knew about the suicidal behavior.  All I asked her was the specifics of how she got there."

The prosecutor acknowledged that the evidence of defendant " 'always trying to get [Doe] to sit on his lap' " was new information that the prosecutor had "just learned about today."  Additionally, it was not previously known that Doe used a razor blade during her suicide attempt, and that during her depression, she had stopped socializing and engaging with her brothers, stayed in her room, weighed herself every day, and cut herself "to feel something."  The trial court asked the prosecutor whether anyone had previously asked Doe about using a blade, and the prosecutor responded, "We didn't know the full details of it until today, no."  The court pressed the prosecutor further, asking if anyone had followed up with Doe for more details about her psychiatric hold and suicidal ideations, and the prosecutor responded, "Her mom informed us actually this morning.  No, we didn't go out and look at those."  Later, the prosecutor suggested that "during the CIC" interview, Doe "admitted to cutting herself in the past, and that she suffers from depression,"[5] to which the trial court responded, "All right.  So there's notice there."  Later, however, the prosecutor clarified that Doe did not tell the CIC interviewer that "she cut herself to feel something and release pain," as "that was me expanding upon her prior statements about cutting herself."

Regarding the incident at the swimming pool, the trial court confirmed that Detective Nunemaker previously gave testimony at the preliminary hearing regarding Doe's account of this incident.  Specifically, Doe told Nunemaker that on one or two occasions when she was about six years old, defendant "told her to take her bathing suit top down so he could see her

---

[5]     As defendant clarifies in his briefing, the CIC interview transcript contained no mention of the suicide attempt or prior acts of self-harm by Doe.

15

breasts, and she did." Defense counsel argued, however, that in the statement released to her that day, "it's relayed that [defendant] told Jane Doe he wanted to see her chest, he tried to touch her chest. I'm not sure if this is [the prosecutor's] narrative, but sounds like [defendant] tried to touch her chest, and Jane Doe walked away and pulled away." The prosecutor told the court that "[t]he statement was her chest hurt and he wanted to see it. I didn't go into further detail. That's just me summarizing it."

Defense counsel argued that the newly disclosed information could "be incredibly persuasive to the jury in a sympathetic way" and "prejudicial" to defendant because "the scope of this trial is that these behaviors are directly tied to my client's conduct, absent an opinion from an expert. And because I'm just getting this information now, there's a very limited way that I'm able . . . to effectively cross-examine on it."

The trial court admonished the prosecutor for not interviewing Doe until the day of opening statements, calling the practice "not fair" and "not acceptable," and describing Doe as a resilient and cooperating witness. The court also found that the newly disclosed information was "highly relevant" to the case. However, the court did not find that the prosecutor's actions warranted a mistrial because "[a] lot of the substance is of what was already turned over, so there is notice. The fact that she was cutting herself, it's not that far-fetched to think it was a blade as opposed to pencil or pen. It had to be some sort of sharp edge. So that's not that far-fetched." The court decided that a continuance of trial for the rest of the day would be an appropriate remedy, as it would give defense counsel additional time to prepare for cross-examination on the newly disclosed information.

The next morning, defense counsel renewed the motion for a mistrial. As defense counsel explained, "coming into this trial my universe of

16

information was the reports, the CIC interview, and the 115 prelim . . . . [¶] I knew that Jane Doe had been admitted in September 2019 on a psych hold. That was in the report. . . . I knew that Norma had told Detective Nunemaker that Jane Doe suffered from depression and exhibited such signs and suicidal thoughts. [¶] Cutting in the past was mentioned in the report, but wasn't actually stated from Jane Doe in the CIC interview. [¶] Jane Doe wrote a letter referencing her depression and anorexia, and then Detective Nunemaker included in his report that Jane Doe had attempted suicide. [¶] Suicide is not mentioned in the CIC interview by Jane Doe. Suicide was not mentioned by any witness statements, including that of the nurse. It was not mentioned at prelim."

Defense counsel further argued that she "was not anticipating, nor prepared for what now essentially has become or could become a trial on Jane Doe's mental health conditions," and that it was now too late to secure an expert who could testify that Doe's behaviors "could also be indicative of any number of mental health conditions," or to subpoena records that might call her testimony into question. Counsel also expressed her frustration with the prosecution for preventing her from contacting Doe's family members.

The prosecutor argued he had already provided defense counsel with an appropriate amount of discovery, including a letter written by Doe on a notetaking application on her phone.[6] In that letter, Doe specifically wrote that she was "fighting with depression [a]nd anorexia." Thus, the prosecutor argued, "the information about suicide and anorexia was there. Taken in conjunction with the statement from the reports about cutting, I think it was abundantly clear." The prosecutor also argued it was already known that

---

[6] The letter was marked as an exhibit but was not introduced into evidence at trial.

17

Norma observed changes in Doe's behavior after the Mexico trip. Regarding defense counsel's attempts to contact the witnesses, the prosecutor argued that Doe's parents had expressly told him they wanted to be left alone, and he simply conveyed that request to defense counsel.

The trial court denied the renewed motion for a mistrial. The court first observed that the prosecution's decision not to interview the witnesses earlier presented a risk that their testimony could be so prejudicial that a continuance or late discovery instruction would not cure it, but that was "a choice the People make," and it was not the court's "role to tell them how to do their job." Turning to the late discovery in this case, the court found that defendant already had notice of the swimming pool incident from the preliminary hearing, and the court noted that the prosecutor "clarified" it was only "his impression" that defendant wanted to touch Doe's chest. The court emphasized it would not permit such speculation by the prosecutor during argument or Doe during her testimony to be admitted into evidence.

Regarding the new information that defendant tried to get Doe "to sit on his lap all the time," the trial court stood by its prior rulings that the prosecution violated discovery by the late disclosure, but that a brief continuance was an adequate remedy.

With regard to Doe's depression, acts of self-harm, and suicide attempt, the trial court found there was no discovery violation, as the defense was already on notice of these matters from other disclosed evidence, including Doe's letter. The court repeated its prior finding that the new information about Doe's use of a razor blade during the suicide attempt was "not something that could not reasonably be inferred" given it was documented that she had suicidal ideations and was placed on a psychiatric hold. Thus, in the court's view, the defense "had every opportunity to secure a witness

18

and an expert to either discuss [whether] these things that she's talking about [are] consistent or inconsistent with sexual abuse, and the Defense chose not to. [¶] [The prosecutor's] late disclosures have nothing to do with that decision by Counsel, because the letter put everybody on notice of what would be discussed."

At trial, Doe testified that during the swimming pool incident, defendant asked to see her chest and then pulled on the top of her swimsuit. She further testified that in the aftermath of the Mexico trip, she began struggling with mental illness and would harm herself by "[j]ust cut[ting] my wrists" using a razor blade, initially not to kill herself, but "[t]o feel something." Doe further testified that she isolated herself in her room all day and would not spend time with her brothers because she "[j]ust wanted to be alone." She attempted suicide by slitting her wrist. The prosecutor reiterated this testimony during closing arguments, mentioning Doe's depression, acts of self-harm "so she could feel something, anything, any type of pain to make her feel still alive," and her suicide attempt using "a razor blade."

### 2. *Analysis*

" ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Edwards* (2013) 57 Cal.4th 658, 703.) We review a trial court's denial of a mistrial motion for abuse of discretion. (*People v. Clark* (2011) 52 Cal.4th 856, 990.)

19

"Section 1054 et seq. govern discovery in criminal cases and aim at flushing out the truth early and avoiding the element of surprise (on both sides) in criminal trials. ' "The purpose of section 1054 et seq. is to promote ascertainment of truth by liberal discovery rules which allow parties to obtain information in order to prepare their cases and reduce the chance of surprise at trial. [Citation.] Reciprocal discovery is intended to protect the public interest in a full and truthful disclosure of critical facts, to promote the People's interest in preventing a last minute defense, and to reduce the risk of judgments based on incomplete testimony." ' " (*People v. Hughes* (2020) 50 Cal.App.5th 257, 278 (*Hughes*); see § 1054, subds. (a)–(d).)

To further these ends, section 1054.1 requires the prosecuting attorney in criminal cases to disclose to the defendant or defense counsel certain categories of "materials and information" that are "in the possession of the prosecuting attorney" or that the prosecuting attorney "knows to be in the possession of investigating agencies." (§ 1054.1.) This includes "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial." (*Id.* at subd. (f).) The disclosures must be made at least 30 days prior to the trial, unless the deadline is extended for good cause, or immediately if the materials become known to, or come into the possession of, a party within 30 days of trial, unless extended for good cause. (§ 1054.7.) "California courts long have interpreted the prosecutorial obligation to disclose relevant materials in the possession of the prosecution to include information 'within the possession or control' of the prosecution," which "encompass[es] information 'reasonably accessible' " and " 'readily available' to the prosecution and not accessible to the defense." (*In re Littlefield* (1993) 5 Cal.4th 122, 135 (*Littlefield*).)

"Upon a showing that a party has not complied with Section 1054.1 or 1054.3 . . . , a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order.  Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." (§ 1054.5., subd. (b).)  " 'It is the defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm.' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 386.)

The prosecution does not have a "general duty to seek out, obtain, and disclose all evidence that might be beneficial to the defense," or "to obtain a written statement from a witness, even if the witness is ready and willing to give such a statement." (*Littlefield*, *supra*, 5 Cal.4th at pp. 135–136, italics omitted.)  We observe that a prosecutor coming into possession or control of new information within the meaning of section 1054.1 when an interview with a witness occurs just before trial may avoid violating section 1051.1, subdivision (f), by immediately disclosing information to the defense following completion of the interview (§ 1054.7).  That said, a prosecutor's decision to delay an interview—particularly where a cooperating witness has asked not to be contacted by the defense—might hinder the express purposes of the discovery statutes to promote the timely ascertainment of truth, save the court's time, avoid the necessity for interruptions and postponements, and prevent surprise to the defense.  (*Hughes*, *supra*, 50 Cal.App.5th at p. 278; § 1054, subds. (a)–(d).)

21

In this case, the trial court commented that the prosecution took risks by electing to interview key witnesses for the first time on the eve of trial.[7] Although the prosecutor insisted he refrained from interviewing Doe earlier in order to avoid subjecting her to unnecessary trauma, that did not explain his decision to delay interviewing other witnesses, such as Norma. Furthermore, as the trial court found, Doe was a cooperating witness who was capable of being interviewed earlier.

Nonetheless, on the record before us, we conclude the trial court appropriately assessed the totality of the situation and reasonably concluded that the prosecution's actions did not violate section 1054.1, subdivision (f) or result in incurable prejudice to defendant, and that a brief continuance of trial was sufficient to remedy any surprise occasioned by the disclosure of new information on the day of opening statements.

To reiterate, the newly disclosed information was as follows. Doe used a razor blade during her suicide attempt; during her depression, Doe stopped engaging with her brothers, stayed in her room all day and did not socialize, weighed herself, and engaged in self-harm in order to "feel something." Additionally, defendant would "always" try to get Doe to sit on his lap, and during the swimming pool incident, defendant tried to touch Doe's chest.

The materials that were timely produced to the defense during pretrial discovery were as follows: the police reports by Officer Hidalgo and Detective Nunemaker[8]; the CIC interview transcript; and Doe's letter. It appears

_____

[7] For instance, Norma was prepared to give potentially graphic testimony regarding the degree of bleeding from Doe's wrists on the day of her hospitalization, but the trial court preemptively refused to allow that testimony.

[8] The police reports are not in the record before us. However, the probation report, though written after trial, describes the contents of one of the police reports in detail. The record also includes the transcript of

undisputed that a copy of Doe's letter was provided to the defense at the same time the police reports were produced. Meanwhile, the defense acknowledged that Detective Nunemaker's report specifically mentioned Doe's suicide attempt. Although defendant points out that neither Doe's letter nor the CIC interview transcript mentioned cutting or acts of self-harm, the letter spoke of Doe's "depression [a]nd anorexia" and her "trauma[]" from defendant's abuse. Moreover, defense counsel specifically acknowledged during arguments on the mistrial motion that she was aware of Doe's suicidal ideations and psychiatric hold, and that "[c]utting in the past was mentioned in the report." We may reasonably infer the referenced "report" pertained to one of the police reports timely produced in pretrial discovery.

Additionally, the preliminary hearing transcript reflects that Detective Nunemaker testified having been told by Norma that Doe was "suffering from depression and suicidal ideations"; that she had been admitted to the hospital multiple times for mental health evaluations; and that the signs of her depression had begun around 2017, which was when the family saw defendant in Mexico.

Based on the foregoing, the trial court could reasonably conclude that despite the prosecutor's delay in interviewing the witnesses, ample information had been disclosed to the defense before trial regarding Doe's suicide attempt, depression, suicidal ideation, past acts of cutting, and anorexia that purportedly stemmed from defendant's alleged acts of sexual abuse. In sum, the record supports the court's determination that defendant had a reasonable opportunity to prepare to address these matters in advance

---

preliminary hearing, during which Detective Nunemaker gave testimony based on his report.

of trial and was therefore not so unfairly surprised on the day of opening statements as to warrant a mistrial.

Defendant nevertheless maintains that the prosecution's delay was prejudicial for several reasons. First, the delay precluded him from subpoenaing records, investigating the chronology of Doe's behaviors, and retaining an expert to opine that her behavioral changes resulted from any number of health conditions rather than sexual trauma. We are not persuaded, as the pretrial discovery sufficiently disclosed specific mental and behavioral issues germane to the decision whether to retain a mental health expert and subpoena records. Likewise, the relevant chronology was already known, including Doe's age at the time of the initial offenses and Norma's observation that her daughter's behavioral changes began to manifest after the Mexico trip in 2017. Moreover, we do not accept defendant's suggestion that he was misled by the prosecution's motion in limine to exclude evidence regarding Doe's mental health history. Defendant acknowledges the motion was filed one week before opening statements, by which time defendant had already made the decision to go to trial without an expert.

Next, and contrary to defendant's contention, the trial court could reasonably conclude the delayed disclosure of Doe's use of a razor blade during a suicide attempt was not incurably prejudicial. As the court pointed out, it was reasonable to infer that Doe used a sharp implement during the suicide attempt, and the gravity and severity of the incident was inferable from her hospitalization and placement in a psychiatric hold.

Regarding the swimming pool incident, the trial court concluded defendant was already on notice from the preliminary hearing of Doe's accusation that he told her to pull her bathing suit top down so he could see her chest. Although the newly disclosed information was different in that

Doe now accused defendant of wanting to *touch* her chest, the court could reasonably conclude the difference was slight, and that a brief continuance would give defense counsel adequate time to prepare to meet this allegation. (See *People v. Hammond* (1994) 22 Cal.App.4th 1614, 1624 [recognizing need for "flexibility" in evaluating prosecutor's decisions regarding evidence-gathering, as "[a] trial is not a scripted proceeding" and "witnesses who have been interviewed vacillate or change their statements"].)

Likewise, the trial court reasonably concluded the late disclosure of the "new" information that defendant had "always" tried to get Doe to sit on his lap was not so prejudicial that a brief continuance would be an inadequate remedy. Indeed, any error on this particular point was ultimately harmless. During her eventual trial testimony, Doe did not testify that defendant "always" tried to get her to sit on his lap or that she did, in fact, sit on his lap during any of the incidents of abuse. Rather, she testified that he motioned for her to sit on his lap during the first instance of abuse in the guest room in 2010, but that he did not make the same gesture during the second incident in the guest room. Doe did not otherwise testify as to any additional similar attempts by defendant to get her to sit on his lap.

In sum, we conclude the trial court did not abuse its discretion in denying defendant's motion for a mistrial. Given all the evidence before it, the court reasonably concluded that defendant was not incurably prejudiced by the prosecutor's disclosure of information on the day of opening statements, and that a half-day's continuance of trial was an adequate remedy.

## C. Restitution for Noneconomic Damages

Defendant argues the restitution order for $750,000 in noneconomic damages shocks the conscience and constitutes an abuse of discretion. We find no error.

### 1. *Additional Facts*

Prior to sentencing, the prosecutor requested a restitution award of $1,000,000 for noneconomic damages under section 1202.4, subdivision (f)(3)(F). The prosecutor argued Doe had suffered irreparable psychological harm from the childhood sexual abuse committed by defendant and was at increased risk for psychological and physical health problems. In support, the prosecutor relied on Doe's letter as well as the trial testimony that she had withdrawn from her family, engaged in unhealthy practices with regard to eating and self-harm, and ultimately attempted to end her life. The prosecutor also read impact statements written by Norma and Doe to the trial court.

The defense responded that a restitution award in the amount of $1,000,000 would shock the consequence and suggest that improper passion or prejudice motivated the award. The defense emphasized the mitigating circumstances in the case, including defendant's lack of a criminal history or other victims or accusations against him. The defense further contended the cases in which reviewing courts upheld noneconomic damage awards in large amounts like $1,000,000 and $750,000 involved far more egregious and prolonged conduct than what occurred in this case.

Based on the trial testimony and impact statements, the trial court awarded $750,000 in noneconomic damages. The court explained that "given the body dysmorphia as well as the suicidal ideation and attempted suicide, . . . this award clearly demonstrates ongoing pain and suffering by Jane Doe,

and she will likely need treatment—ongoing treatment now and into the immediate future."

### 2. Analysis

Trial courts are required to order criminal defendants to pay restitution to the victims of their crimes. (Cal. Const., art. I, § 28, subd. (b)(13)(B); § 1202.4, subdivision (f).) While restitution is generally limited to economic damages, section 1204, subdivision (f)(3)(F) provides for restitution for "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288, 288.5, or 288.7." Noneconomic damages are defined as "subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (Civ. Code, § 1431.2, subd. (b)(2).)

"The burden is on the party seeking restitution to provide an adequate factual basis for the claim." (*People v. Giordano* (2007) 42 Cal.4th 644, 664.) Relevant evidence includes the victim's trial testimony, statements and testimony by the victim's parents, a treating physician or therapist, or others with personal knowledge of the impact on the victim. (See *People v. Gomez* (2023) 97 Cal.App.5th 111, 119 (*Gomez*); *People v. Lehman* (2016) 247 Cal.App.4th 795, 801, 803–804 (*Lehman*).) The "evidentiary bar" for noneconomic damages "is a low one," but it must show the impact of the crime on the particular victim, not just victims generally. (*Gomez*, at pp. 119–120.)

" ' "No fixed standard exists for deciding the amount of these damages." ' " (*Lehman*, *supra*, 247 Cal.App.4th at p. 801.) Courts may use " 'any rational method of fixing the amount of restitution which is reasonably calculated to make the victim whole.' " (*People v. Ortiz* (1997) 53 Cal.App.4th

27

791, 800.) The "amount need not be tied to any specific damages, but rather the trial court, within its discretion, tries to determine the appropriate compensation for such pain and suffering." (*People v. Narro* (2023) 95 Cal.App.5th 316, 329.)

" 'A restitution order is reviewed for abuse of discretion and will not be reversed unless it is arbitrary or capricious. [Citation.] No abuse of discretion will be found where there is a rational and factual basis for the amount of restitution ordered. " '[T]he standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt.' " ' " (*Lehman, supra,* 247 Cal.App.4th at p. 801.) We will affirm a restitution order for noneconomic damages that does not, at first blush, shock the conscience or suggest passion, prejudice or corruption on the part of the trial court. (*People v. Smith* (2011) 198 Cal.App.4th 415, 436 (*Smith*).)

The restitution award in this case had a clear factual basis in the record. The trial testimony, police reports, impact statements, and letter from Doe provided evidence of the victim's years of self-isolation, self-harm, anorexia, and suicidal ideations. Her pain and suffering did not end when defendant moved away and stopped molesting her, and she continued to be in therapy at the time of the trial. In her own words, Doe expressed that the molestations caused her " 'uncontrollable pain,' " " 'destroyed' " her, and left her with " 'nothing to enjoy.' " It had become " 'very difficult for [her] to trust people now,' " and she " 'can't find happiness yet.' " Norma similarly expressed in her impact statement that defendant "did so much damage to Jane Doe that she cannot even imagine" and he "took away her childhood." On this record, the trial court could reasonably conclude that Doe was entitled to substantial noneconomic damages in order to address the past and ongoing psychological harm caused by defendant's crimes.

Defendant maintains the amount of the award shocks the conscience because the abuse in this case was less severe in kind and duration than in cases like *Lehman* and *Smith*, where restitution awards of $900,000 and $750,000, respectively, were affirmed. As defendant points out, *Lehman* involved dozens of sex offenses (including oral copulation of a minor) by the defendant against his granddaughter beginning when she was 9 or 10 years old and continuing through late high school. (*Lehman*, *supra*, 247 Cal.App.4th at p. 798.) In *Smith*, the defendant was married to the victim's mother and began molesting the victim when she was eight years old. (*Smith*, *supra*, 198 Cal.App.4th at p. 420.) The molestations occurred regularly, and the abuse became more severe over time, escalating from unwelcome touching to oral copulation when the victim was 14 years old and eventually penile penetration when she was 16. (*Ibid*.) Defendant argues that here, in contrast, his convictions for sexual penetration of a child and lewd and lascivious acts with a child were based on less severe acts of abuse, and the first two penetrations were from a single incident.

Though *Lehman* and *Smith* involved crimes of greater severity and duration than the instant matter, they do not compel the conclusion that the trial court here lacked a rational method for fixing restitution in the amount that it did. The law does not assume that noneconomic damage awards across different cases fall neatly along a single continuum based on the severity of the crimes. Rather, the court's proper focus is on the impact of the crimes on the particular victim and factual record before it. (*Gomez*, *supra*, 97 Cal.App.5th at pp. 119–120; see *Lehman*, *supra*, 247 Cal.App.4th at pp. 803–804.) In any event, a comparison of the instant case with *Lehman* and *Smith* does not necessarily assist defendant in all particulars, as the victim here was younger than the victims in those cases when the abuse

29

started.  On the particular factual record before it, the trial court could, within the reasonable exercise of its discretion, conclude a substantial restitution award was appropriate compensation for Doe's pain and suffering.

In sum, we cannot conclude that the trial court abused its discretion or that the noneconomic restitution award shocks the conscience.

## DISPOSITION

The judgment is affirmed.

_____
Fujisaki, J.


WE CONCUR:


_____
Tucher, P.J.


_____
Petrou, J.


*People v. Regalado-Mandujano* (A166546)